IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE U.S. DISTRICT. COURT
AT ROANOKE, VA
FILED

SEP 05 2024

LAURA A. AUSTIN, CLERK
BY: _____
DEPUTY CLERK

JAMAL KEMO SAUNDERS, a/k/a )
FOREVER AL-MANI HAMILTON, )
 )
    Petitioner, )
 )
v. )
 )
DIRECTOR HAROLD CLARKE, )
 )
    Respondent. )

Case No. 7:23-cv-416

By:   Michael F. Urbanski
Senior United States District Judge

## MEMORANDUM OPINION

Jamal Kemo Saunders, an inmate proceeding pro se, has filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his 2013 Danville Circuit Court conviction for possession of a firearm by an individual under the age of 29 with a prior violent juvenile conviction pursuant to Va. Code § 18.2-308.2.[1] Respondent filed a motion to dismiss, ECF No. 11, which is ripe for disposition. After thoroughly reviewing the record, the court **GRANTS in part** and **DENIES in part** the motion to dismiss. The court **GRANTS** the motion as to Claims One and Three and **DENIES** the motion as to Claims Two and Four. Additionally, the court **ORDERS** the appointment of the Federal Public Defender for Saunders and further **ORDERS** the parties to engage in 120 days of discovery limited to the issues raised by Claims Two and Four. The court will hold an evidentiary hearing on Claims Two and Four after the close of discovery.

---

[1] Saunders is being held in Massachusetts pursuant to the judgment of the Danville Circuit Court. See Am. Pet., ECF No. 10, at 1. Saunders' petition is properly filed in this court because the Danville Circuit Court is located within the Western District of Virginia. See 28 U.S.C. §§ 2241(d).

1

In sum, Saunders has presented evidence that the Commonwealth possessed, but did not disclose to the defense, material and potentially exculpatory evidence consisting of metal fragments that had been surgically removed from the victim's body after the shooting in violation of Brady v. Maryland, 373 U.S. 83 (1963) (Claim Two). These fragments may raise the reasonable probability that the weapon Saunders possessed was not a firearm as that term is defined with respect to Va. Code § 18.2-308.2(A), but rather a pellet gun. See Armstrong v. Commonwealth, 263 Va. 573, 584, 562 S.E.2d 139, 145 (2002) ("We hold that in order to sustain a conviction for possessing a firearm in violation of Code § 18.2-308.2, the evidence need show only that a person subject to the provisions of that statute possessed an instrument which was designed, made, and intended to expel a projectile by means of an explosion."); Startin v. Commonwealth, 281 Va. 374, 382, 706 S.E.2d 873, 878 (2011) ("[N]either the replica at issue here nor the BB gun in Holloman[ v. Commonwealth, 221 Va. 196, 269 S.E.2d 356 (1980)] would be sufficient to convict a person under Code § 18.2-308.2 for possession of a firearm by a convicted felon because they are not 'designed, made, and intended to fire or expel a projectile by means of an explosion.'" (quoting Armstrong, 263 Va. at 583, 562 S.E.2d at 145)). However, there remain several unresolved factual issues as the Commonwealth disputes that it ever had these metal fragments in its possession. Because the record is insufficiently developed on this point, the court directs the parties to engage in 120 days of discovery on Claim Two.

Additionally, factual disputes preclude the court from ruling on Saunders' claim for ineffective assistance of counsel (Claim Four). Saunders claims that his trial counsel failed to investigate and obtain certain of the victim's medical records, including CT and x-ray images,

which could shed light on the issue of whether the object that pierced the victim's body was a bullet from a firearm or a pellet from a pellet gun. Accordingly, the parties are directed to engage in discovery on Claim Four. The court will hold an evidentiary hearing to address the merits of these two claims at the close of discovery.

## I. Background

The court will first review the events giving rise to this petition, including the relevant facts underlying Saunders' criminal case and the subsequent evidentiary developments. The court will then review the procedural history that predated this petition.

### A. Summary of the Evidence

On the afternoon of July 4, 2013, Danny Roberts[2] and Timothy "Tank" Brandon[3] were walking down Worsham Street in Danville, Virginia celebrating Independence Day. They passed Saunders standing on the front porch of a nearby house. Saunders called out to Roberts, getting his attention, and told Roberts "I'm going to shoot you in the face." Saunders pointed a weapon at Roberts, which appeared to Roberts to be a .22 caliber long rifle, and fired twice, hitting Roberts in the chest.

No loud sound, or "bang," came from the weapon when Saunders fired it. Instead, the weapon made a "pshht" sound. Roberts did not feel anything when he was hit, returning home without further incident. ECF No. 13-6, at 44–46. Upon arrival, Roberts' girlfriend noticed that he had blood on his shirt, and Roberts expressed his surprise because he had not felt anything that would cause him to bleed. Id. Roberts found the wound and patched his injuries.

---

[2] Roberts passed away in 2016 during a home fire. See ECF No. 10-1, at 29.
[3] The record contains multiple references to Brandon's nickname, Tank. The court will refer to Brandon by his surname.

Id. He did not seek medical attention for four days, until on July 8, 2013, he went to the hospital for treatment, at which time he told the medical professionals that he had been shot. Id. Officer R. L. Compton of the Danville Police Department spoke with Roberts and initiated an investigation into the shooting. See ECF No. 10-1, at 90.

Saunders subsequently was indicted for malicious wounding, use of a firearm in commission of a felony, and possession of a firearm under age 29 with prior violent juvenile conviction related to the events of July 4, 2013.[4] Saunders pled not guilty to these three charges and waived his right to trial by jury, agreeing instead to be tried by the trial court as factfinder. At the November 20, 2013, trial, Roberts testified that Saunders had shot him with a .22 caliber rifle. He also testified, however, that the weapon did not sound like a firearm when Saunders shot it, and that he knew it was not a real gun when he heard it. The court convicted Saunders of these three charges and on January 16, 2014, sentenced Saunders to five years of imprisonment on the possession charge, three years of imprisonment on the use of a firearm in the commission of a felony charge, and eight years of imprisonment on the malicious wounding charge. The court suspended five of the eight years imposed on the malicious wounding charge for a total period of 11 years of active incarceration.

More than six years later, in October 2020, Saunders contacted Penny Roberts, Danny Roberts' mother, and informed her that the trial court sentenced him to five years of incarceration on the possession charge because Danny Roberts testified that Saunders shot him with a .22 caliber firearm. Penny told Saunders that, before his trial, she witnessed her son

---

[4] Roberts also was indicted for a hit and run on the same day and for events that occurred on July 5, 2013, but those charges arose from events unrelated to those giving rise to this petition.

tell the prosecutor that Saunders had used a .22 caliber air pellet rifle, not a firearm, to shoot him. On December 9, 2020, Penny signed a declaration consenting to Saunders' possession of Danny Roberts' medical records associated with his July 8, 2013, treatment. ECF No. 10-1, at 38.

In relevant part, Danny Roberts' medical records contain CT scans and an x-ray of his chest. See id. at 43–50, 53, 58–62. Dr. Stacy Jo Williams ordered chest and abdominal/pelvic CT scans, which were reviewed by Dr. G. Michael Spencer. Id. at 58–59. Dr. Spencer's report stated that "[t]here is a metallic foreign body which may represent a bullet or bullet fragment seen in the subcutaneous tissues of the left side of the upper abdomen." Id. at 58. In the impression section of his report, Dr. Spencer stated "[s]ubcutaneous metallic foreign body in the left upper abdomen without associated fractures, soft tissue air or hematoma. This presumably represents a subcutaneous bullet or bullet fragment." Id. On further review, Dr. Douglas R. May found that the CT scans showed "apical blebs[,] . . . probable fatty infiltration of the liver . . .[, and] mild pancreatic duct dilation," but that "[n]o other abnormalities are seen." Id. at 61. Dr. Williams also ordered a chest x-ray, which Dr. Spencer found showed "[n]o acute plain radiographic findings." Id. at 60.

On October 12, 2021, Penny Roberts signed an affidavit recounting her phone call with Saunders, the interaction she observed between her son and the prosecutor before Saunders' trial, and several additional statements she observed her son make regarding the fact that Saunders had shot him with an air rifle, not a firearm. See ECF No. 10-1, at 29–37.

After receiving Roberts' medical records, Saunders contacted Ronald R. Scott, an independent forensic consultant who provided services related to firearms and ballistics

analysis.[5] See ECF No. 10-1, at 63–82. Scott reviewed Roberts' medical records, including the CT scans and x-ray image, and concluded that the object shown in the radiographic images was not a bullet, but rather a domed pellet, which can only be discharged from an air gun.[6] Id. at 65–66. Scott explained that a domed pellet is defined by its distinctive shape, which includes a skirt, waist, and domed head. Id. at 66. Scott opined that the radiographic images "clearly show[] the rounded head, the tapered waist, and the skirt" of the domed pellet and that the object could not have been propelled from a firearm by explosive action. Id. Scott also stated that the "projectile wound of Danny Roberts is totally inconsistent with the wounding effect of a bullet discharged from a firearm by means of an explosive charge (propellant)." Id. Scott explained that the penetration of a .22 caliber bullet would produce "a temporary large wound cavity followed by the permanent, and much smaller, wound cavity after the projectile terminates in the soft tissue and the temporary cavity collapses" because of the bullet's heavy mass and fast velocity. Id. In contrast, the mass and velocity of a domed pellet of a similar caliber is much lower. Id. Scott attached one of Roberts' radiographic images and annotated it to show the skirt, waist, and domed head of the object. Id. at 70.

Saunders alleges that on June 9, 2021, he learned that the Commonwealth failed to disclose to him fragments of the object that were surgically removed from Roberts after the shooting. See Am. Pet., ECF No. 10, at 25. In full, Saunders alleges the following:

> On June 9th[,] 2021, Mr. Saunders was made aware through a published Memorandum by the Office of the Attorney General

---

[5] It is unclear whether Saunders or Joseph Painter, an attorney, contacted Scott. See ECF No. 10-1, at 65.
[6] The version of Scott's report attached to Saunders' amended petition is neither signed nor dated. See ECF No. 10-1, at 63–82. Accordingly, the court cannot identify when Scott prepared the report, but the court assumes that it was prepared after Saunders received Roberts' medical records in December 2020 and before the Virginia Court of Appeals ruled on the actual innocence petition on February 9, 2022, because the court referenced the analysis in its decision. ECF No. 13-1, at 10.

of Virginia that the Commonwealth Attorney was in possession of, but failed to disclose to the defense, physical evidence that forensic analyse [sic] would have proven to be exculpatory and favorable evidence to Mr. Saunders.

The Office of the Attorney General of Virginia interviewed Danville Police Department Detective Casey Allen on June 9th[,] 2021. Detective Allen was the lead detective on Mr. Roberts[']criminal allegations that Mr. Saunders had shot him with a rifle on July 4th[,] 2013. In that published Memorandum, Detective Allen made the following statement (IN RELEVANT PART):

> "[H]aving obtained a medical release from Roberts, Allen went to the Piedmont Surgical Center and retrieved fragments that were surgically removed from Roberts.
>
> "Allen stated that the fragment(s) came inside a clear, glass container.
>
> "From the surgical center, Allen went to the Courthouse and gave the container to the Commonwealth Attorney who submitted it to the Court as evidence.
>
> "Allen stated that all of this was done on the same day as trial."

Id. Saunders claims that he never received these fragments. Id. at 26. He also claims to attach the memorandum to his amended petition, but it does not appear anywhere in the record. See ECF No. 10-1, at 1 (identifying the memorandum as Exhibit 1). However, the court obtained the records associated with Saunders' actual innocence petition from the Virginia Court of Appeals, which includes the June 9, 2021, memorandum referenced by Saunders in this amended petition. See Saunders' Actual Innocence File, at 535. The memorandum summarizes statements made by Detective Casey Allen, who was the lead detective on Saunders' 2013 criminal case. The memorandum states in full:

> Casey Allen was a detective with the Danville Police Department back in 2013 and was the lead detective in the Saunders case. Having obtained a medical release form from Roberts, Allen went to the Piedmont surgical Center and retrieved the fragment(s) that were surgically removed from Roberts. Allen stated that the fragment(s) came inside of a clear, glass container. Allen does not recall having to sign any documents at the surgical center to obtain the container. Allen also does not recall what the fragment(s) looked like and was unable to provide a description.
>
> From the surgical center, Allen went to the courthouse and gave the container to the Commonwealth Attorney who submitted it to the court as evidence. Allen stated that all of this was done on the day of trial.
>
> When asked if Allen was present for any sort of pretrial conference which involved Roberts, the Commonwealth Attorney, Allen and/or any other LEOs, Allen stated that he does not recall being part of one. Allen does not recall Roberts ever telling him that he was shot with a BB/pellet gun.

Saunders Actual Innocence File, at 535. The Danville Police Department denies ever having possessed the fragments or creating a property log in Saunders' case. Id. at 536. Additionally, SOVA Health, the successor of the hospital at which Roberts had surgery, identifies several dates on which Roberts had appointments at the hospital, each of which occurred before the date of Saunders' trial. See id. at 537.

In November 2022, Saunders spoke with Timothy "Tank" Brandon, who later signed an affidavit stating that he was not present with Roberts on July 4, 2013, and that he did not witness Saunders shoot Roberts.[7] Id. at 83–86.

---

[7] Roberts testified at trial that he had been walking with Brandon when the events giving rise to this petition occurred. See ECF No. 13-6, at 44–45.

### B. Procedural History

The court will review Saunders' trial, direct appeal, and collateral proceedings each in turn.

### 1. Trial Court Proceedings

On July 11, 2013, a Virginia magistrate issued a criminal complaint and a warrant for Saunders' arrest in connection with the events of July 4 and 5, 2013. ECF No. 13-6, at 151–153. Saunders was arrested the next day, and the court held a preliminary hearing on July 13, 2013, at which time the court certified the case to the grand jury. Id. The court appointed counsel for Saunders from the Public Defender's Office in Danville. See id. at 1.

The Commonwealth provided three separate batches of discovery to Saunders in advance of trial. On July 25, 2013, the Commonwealth gave Saunders copies of his criminal record, the Danville police report prepared in relation to the events of July 4 and 5, 2013, and photographs of Roberts' injuries and of the individuals presented to Roberts in the lineup conducted by the Danville Police Department during its investigation. See ECF No. 13-7, at 8. The Commonwealth also informed Saunders that Roberts had been convicted of possession of a schedule II narcotic in 2009. Id. On October 15, 2013, the Commonwealth provided to Saunders the record of his juvenile conviction, 20 pages of Roberts' hospital records, and Saunders' written statement to the police.[8] Id. at 19. Finally, on November 4, 2013, the Commonwealth gave Saunders copies of estimates received in connection with the hit and run, which was unrelated to the events giving rise to this petition. Id. at 52.

---

[8] This statement does not appear in the record.

9

Saunders contends that Roberts' hospital records disclosed as part of the October 15, 2013, discovery included records showing that Roberts' treating physicians had ordered and reviewed CT scans and an x-ray image of Roberts' chest. See Am. Pet., ECF No. 10, at 33. Specifically, Saunders contends that these records included Dr. Mays' evaluation of the CT scans, but Saunders claims that the records did not include other physicians' interpretations of those images or copies of the images themselves. Id. at 34.

On October 28, 2013, a Danville grand jury returned six indictments against Saunders for events that occurred on July 4 and 5, 2013. See ECF No. 13-7, at 23–28. As to the events of July 4, 2013, the grand jury returned indictments for malicious wounding, use of a firearm in commission of a felony, possession of a firearm under age 29 with prior violent juvenile conviction, and hit and run.[9] Id. at 23–25, 28. As to the events of July 5, 2013, the grand jury returned indictments for possession of a firearm under age 29 with prior violent juvenile conviction and brandishing a firearm for events not relevant to this petition. Id. at 26–27.

Less than one month after the grand jury returned the indictments, on November 20, 2013, Saunders proceeded to trial. Saunders pled not guilty to each charge and waived his right to trial by jury. ECF No. 13-6, at 33–34. Upon the court's inquiry, Saunders confirmed that he had discussed "the advisability of a jury trial versus a trial by the [j]udge without a jury," and that he wished to be tried "[b]y [j]udge without a jury." Id. at 35–37. The court found that

---

[9] As discussed at the January 8, 2014, hearing, the hit and run was unrelated to the other July 4, 2013, charges. See ECF No. 13-6, at 115. On January 16, 2014, just before sentencing on these other July 4 charges, Saunders pled guilty to misdemeanor hit and run, and the events surrounding that conviction are not relevant to this petition.

Saunders had waived his right to trial by jury freely, voluntarily, and intelligently, and the case proceeded to trial with the court as factfinder. Id. at 37.

Each party gave an opening statement. The Commonwealth previewed the testimonial and documentary evidence it intended to submit to the court. Id. at 37–39. The Commonwealth stated that Danny Roberts and his mother, Penny Roberts, would testify as to the events of July 4 and 5, 2013, and that the Commonwealth intended to submit photographs of Roberts' injury and evidence of Saunders' prior juvenile conviction. Id. Saunders' counsel gave the following opening statement: "Your Honor, we filed notice of alibi for all charges now pending before the [c]ourt and I don't have any additional opening on top of that. Id. at 39.

The Commonwealth presented testimony from several witnesses during its case-in-chief. In relevant part, Danny Roberts testified as to the events surrounding the July 4, 2013, shooting. Id. at 42–52. Roberts testified that, as he walked down Worsham Street in Danville that afternoon, Saunders yelled out to Roberts that Saunders intended to shoot Roberts in the face, and that Roberts saw Saunders holding what appeared to be a .22 caliber long rifle. Id. at 44–45. Roberts testified that Saunders shot him twice but that he did not feel anything on impact. Id. at 45. Roberts then returned to his home, at which time his girlfriend noticed blood on his shirt. Id. at 45–46. Roberts patched himself up and did not seek medical attention until four days later, on July 8, 2013. Id. at 49. The Commonwealth introduced four photographs of Saunders' injuries into evidence without objection from Saunders. Id. at 50. Roberts then testified that he was scheduled for surgery related to the injuries he sustained

from the shooting. Id. at 51 ("I have surgery Thursday . . . [t]hey're going to have to take it out.").

On cross examination, Saunders' counsel elicited the following testimony from Roberts about the shooting:

> Q: Okay. Now, you said that the object you saw from the porch, it looked like a long gun?
> A: No. A .22 rifle gun. I know all guns.
> Q: Right, but you, I think, testified at preliminary hearing, "It didn't make no noise like a rifle."
> A: It went like . . . pshht (Indicating).
> Q: Yeah. Just like pshht. Yeah.
> A: No. It wasn't nothing loud. No.
> Q: Not bang like a . . . a rifle, right.
> A: No.
> Q: Understood. That's why you didn't think you'd been shot.
> A: Yeah. I was like oh, but okay. I knew I [sic] won't a real gun when I heard it.

Id. at 56. The Commonwealth objected to Roberts' final answer in the above exchange, which the court sustained, finding Roberts' answer non-responsive. Id. Saunders' counsel did not pursue this line of questioning any further.

Saunders made a motion to strike at the close of the Commonwealth's evidence. As relevant here, Saunders argued that the court should strike the possession of a firearm under age 29 with prior violent juvenile conviction charge considering Roberts' testimony that he heard only a "pshht" sound as opposed to the explosive sound that results from the discharge of a firearm. The Commonwealth opposed the motion based on Roberts' testimony that he

believed Saunders had been holding a .22 long rifle, and the court overruled the motion to strike without explanation on that point.[10] Id. at 82–83.

In his case-in-chief, Saunders presented evidence from two individuals, Ferrell Edmonds, who had seen Saunders on the afternoon of July 4 at a cookout near the location of the shooting, and Shamieka Davis, who testified that she had been with Saunders all of July 4 except between 1:00 p.m. and 3:20 p.m., and all of July 5. Id. at 83–95. The Commonwealth offered no rebuttal evidence.

Saunders combined his renewed motion to strike with his closing argument, arguing again, as relevant here, that there was no explosive sound when Saunders shot him and that Roberts suffered no serious wound. Id. at 98–99. The court noted that the photographs showed that Roberts had been struck by a projectile, and Saunders argued that the court could infer that he had used an air rifle, not a firearm, to shoot Roberts. Id. at 99–101. The court questioned the relevance of this distinction in the following exchange with the prosecutor:

> THE COURT: Well, even if it is a pellet gun it's capable of projecting or expelling a projectile by force, is it not? I mean, is there case law that says that a pellet gun is not a firearm 'cause the jury instruction, I mean, that's what the jury instruction says.
> MR. NEWMAN: Yeah.
> THE COURT: It's . . . a firearm is any instrument that is capable of expelling a projectile by force or gun powder and then it goes on to the second sentence, a firearm is also an object that is not capable of expelling a projectile by force or gun powder but gives the appearance of being able to do so. Now, that's the 18.2-308.4(c) definition. And I mean, here we have evidence that it produced a projectile.
> MR. NEWMAN: I would have to take a look at that. Quite candidly, Judge, I would respectfully submit we have evidence

---

[10] The court's ruling on Saunders' motion to strike focused on the brandishing charge related to the events of July 5, 2013, and the court did not explicitly discuss the motion with respect to the July 4, 2013, possession charge.

> that it produced a projectile and that is a firearm 'cause he's
> identified it as a .22.
> THE COURT: Yeah.

Id. at 107–108. The court acknowledged that the cited definition of firearm applied to the use

of a firearm charge, but did not discuss the different, more limited, definition applicable to the

possession charge. Id.

The court found Saunders guilty of malicious wounding, use of a firearm in the

commission of a felony, and possession of a firearm under age 29 with a prior violent juvenile

conviction for the events of July 4, 2013. Id. at 109–110. The court acquitted Saunders of the

possession and brandishing charges related to the events of July 5, 2013. Id. In relevant part,

the court ruled as follows:

> [I]n this case I do find the defendant guilty of malicious
> wounding and use of a firearm in the commission of a malicious
> wounding. I find him guilty of possession of a firearm by a
> previously . . . essentially a prior convicted felon, although in this
> case it's under age twenty-nine by an individual previously
> adjudicated of an offense which would be a violent felony if
> committed by an adult. I find him guilty of the one on the 4th and
> not guilty of the one on the 5th . . . Now, as far as the 4th is
> concerned . . . It really comes down to, number one, the fact that
> the defendant . . . the victim, rather, and I . . . the [c]ourt does
> accept his testimony as being credible. . . . Now, on the 4th, the
> [d]efense alibi evidence, the [c]ourt accepts as true the testimony
> of Ferrell evidence with reference to the 4th, but actually that
> evidence really does not create an alibi for the defendant. To the
> contrary it puts the defendant in the location where these events
> occurred at a time . . . at the time that the events occurred. Now,
> Mr. Edmonds testified that he saw the defendant for a very, very
> brief time sometime shortly after 3:00 on the 4th, between 3:00
> and 3:30, some thirty seconds. The church is on, I think he said
> 531 Worsham Street . . .
> MR. NEWMAN: Uh-huh
> THE COURT: . . . and we know that this shooting event on the
> 4th took place in close proximity to that address, so that's the
> [c]ourt's ruling.

14

Id.

On January 16, 2014, the court sentenced Saunders to five years of imprisonment on the possession charge, three years of imprisonment on the use of a firearm in the commission of a felony charge, and eight years of imprisonment on the malicious wounding charge. Id. at 142. The court suspended five of the eight years imposed on the malicious wounding charge for a total period of 11 years of active incarceration.

### 2. Direct Appeal

On February 7, 2014, Saunders appealed his conviction for possession of a firearm under age 29 with prior violent juvenile conviction to the Virginia Court of Appeals. See ECF No. 13-7, at 77–78. Saunders argued that the evidence presented at trial did not establish that the weapon qualified as a firearm under Va. Code § 18.2-308.2(A) and that, instead, the evidence left open the reasonable hypothesis that the weapon was an air-propelled gun, such as a pellet gun.

The Court of Appeals rejected Saunders' argument on January 27, 2015. See ECF No. 13-7, at 93–104. Reviewing the evidence presented at trial, the court found that "Roberts' testimony about his familiarity with guns, his specific description of the object that he saw in [Saunders'] hands, and his recounting of the events provided the trier of fact with an ample basis upon which to conclude that the object was a firearm for purposes of [Va.] Code § 18.2-308.2." Id. at 99. The court was further persuaded that Saunders' "direct threat to shoot Roberts during the July 4 encounter was an implied assertion that the object was a firearm," and by the fact that "Roberts sustained an injury consistent with a gunshot wound." Id. The court declined to accept Saunders' references to the "pshht" sound made by the weapon when

fired and Roberts' testimony that he did not feel anything when he was shot as outcome determinative, ruling that those "arguments go to the assessment of the weight of the evidence and the credibility of the victim, decisions for the trier of fact." Id. at 100. The court affirmed Saunders' conviction. Id. at 104.

Saunders filed a petition for appeal with the Supreme Court of Virginia on February 27, 2015. See ECF No. 13-9, at 1. October 13, 2015, the Supreme Court of Virginia refused Saunders' petition for appeal. See ECF No. 13-10. Saunders chose not to file a writ of certiorari in the United States Supreme Court, and the time to do so expired on January 11, 2016. See Sup. Ct. R. 13.

### 3. Collateral Proceedings

Saunders has filed two state petitions for a writ of habeas corpus, a state petition for a writ of actual innocence, and two federal habeas petitions, including this one. The court will discuss each proceeding in turn.

Saunders filed his first state habeas petition in the Danville Circuit Court on June 23, 2017. The court dismissed the petition on March 23, 2018, concluding that it was time-barred.[11] Saunders did not appeal this dismissal.

Next, Saunders filed a federal habeas petition in this court. See Saunders v. Dir. of Va. Dep't of Corr., No. 7:18-cv-176 (W.D. Va. filed Apr. 18, 2018). On May 24, 2018, the court dismissed the petition without prejudice because Saunders did not return the consent-to-fee form as required by the court's previous order. Id., ECF No. 4. The court later vacated this

---

[11] Though the Commonwealth discusses this petition in its motion to dismiss, ECF No. 13, at 2, the record does not include any documentation associated with this petition. The Danville Circuit Court's online case information website shows that Saunders filed this petition on June 23, 2017, and that the court dismissed the petition on March 23, 2018, but does not provide access to the docket or to the basis for dismissal.

order on a motion for reconsideration filed by Saunders and provided him with an additional
30 days to file the consent-to-fee form. Id., ECF No. 6. Saunders never filed the form, and
the court again dismissed the petition on October 24, 2019. Id., ECF No. 7. Saunders did not
attempt to reopen this case.

On January 12, 2021, Saunders filed a petition for a writ of actual innocence in the
Virginia Court of Appeals pursuant to the procedures set forth in Va. Code §§ 19.2-327.10–
19.2-327.14.[12] Saunders argued that Roberts' additional medical records, Scott's analysis, and
Penny Roberts' affidavit "prove that the victim's injuries could not have been caused by a
bullet discharged from a firearm." ECF No. 13-1, at 1. The Commonwealth opposed
Saunders' petition, contending that none of Saunders' purportedly new evidence qualified as
such under the statute.[13] The Commonwealth attached several exhibits to its response to

---

[12] Section 19.2-327.10 provides in relevant part that "upon a petition of a person who was convicted of a
felony . . . the Court of Appeals shall have the authority to issue writs of actual innocence under this chapter."
Va. Code Ann. § 19.2-327.10. The remaining provisions of the chapter set forth the procedures for addressing
these writs and the available remedies, including vacatur and expungement of the conviction. See Va. Code
Ann. § 19.2-327.13.

[13] Section 19.2-327.11 limits the nature of evidence that can give rise to a petition for a writ of actual innocence.
Subpart A provides in full:

> The petitioner shall allege categorically and with specificity, under oath, all of
> the following: (1) the crime for which the petitioner was convicted or the
> offense for which the petitioner was adjudicated delinquent; (ii) that the
> petitioner is actually innocent of the crime for which he was convicted or the
> offense for which he was adjudicated delinquent; (iii) an exact description of
> (a) the previously unknown or unavailable evidence supporting the allegation
> of innocence or (b) the previously untested evidence and the scientific testing
> supporting the allegation of innocence; (iv)(a) that such evidence was
> previously unknown or unavailable to the petitioner or his trial attorney of
> record at the time the conviction or adjudication of delinquency became final
> in the circuit court or (b) if known, the reason that the evidence was not
> subject to scientific testing set forth in the petition; (v) the date (a) the
> previously unknown or unavailable evidence became known or available to
> the petitioner and the circumstances under which it was discovered or (b) the
> results of the scientific testing of previously untested evidence became known
> to the petitioner or any attorney of record; (vi)(a) that the previously
> unknown or unavailable evidence is such as could not, by the exercise of

Saunders' actual innocence petition, including the June 9, 2021, memorandum that summarized the interview of Detective Allen, who said that he had delivered to the Commonwealth's Attorney metal fragments that had been surgically removed from Roberts after the July 4, 2013, incident. See Saunders' Actual Innocence File, at 535. In a footnote to their opposition, the Commonwealth attempted to explain this memorandum:

> The Commonwealth has attempted to locate both the items removed from Mr. Roberts during surgery and the associated medical records. To this end, Investigator Allen was interviewed and the medical records were requested. Mr. Allen maintained that he collected the fragments that were removed from Mr. Roberts and submitted them as evidence at trial. (Respondents Exhibit F). However, given that Mr. Roberts testified at trial that he had not yet had surgery, and no such evidence was submitted, it appears Mr. Allen's recollection is incorrect. The Danville Police Department also has no record of having received these items nor do they currently have them. (Letter from Danville Police Department attached as Respondent's Exhibit G). Finally, the Commonwealth sought the medical records from Piedmont Surgery Center, where Mr. Roberts had surgery, but due to their age and a subsequent take-over of the Piedmont Surgery Center by another hospital, they have been destroyed. (Letter from SOVA Health attached as Respondent's Exhibit H).

---

diligence, have been discovered or obtained before the time the conviction or adjudication of delinquency became final in the circuit court or (b) that the testing procedure was not available at the time the conviction or adjudication of delinquency became final in the circuit court; (vii) that the previously unknown, unavailable, or untested evidence is material and, when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt; and (viii) that the previously unknown, unavailable, or untested evidence is not merely cumulative, corroborative, or collateral. Nothing in this chapter shall constitute grounds to delay or stay any other appeals following conviction or adjudication of delinquency, or petitions to any court. Human biological evidence may not be used as the sole basis for seeking relief under this writ but may be used in conjunction with other evidence.

Va. Code Ann. § 19.2-327.11(A).

Id. at 497. The Commonwealth also attached the letters from the Danville Police Department

and SOVA Health to their response. See id. at 536–537. Notably, the SOVA Health letter

listed several appointments for Roberts, each of which occurred before the November 20,

2013, trial. See id. at 537.

The Court of Appeals dismissed Saunders' petition. The court explained that Roberts'

medical records had existed before Saunders' conviction became final in the circuit court. Id.

at 8–10. The court found that Saunders had admitted that he had received 20 pages of these

records in pretrial discovery, including Dr. Mays' findings on Roberts' CT scans, but that

"[n]othing in the record indicates that the defense attempted to subpoena any of Roberts's

medical records or otherwise pursued the information the Commonwealth produced in

discovery." Id. at 9. Notably, the court observed a lack of diligence:

> We acknowledge, but are unpersuaded by, Saunders's contention
> that he could not have discovered the proffered medical records
> by the exercise of diligence because the Commonwealth
> represented that it was "unaware of any further" discoverable or
> exculpatory evidence. Our diligence inquiry focuses on whether
> Saunders made "devoted and painstaking" efforts to obtain the
> evidence upon which he now relies, not any alleged inadequacy
> in the Commonwealth's discovery response. [Tyler v.
> Commonwealth, 73 Va. App. 445, 464, 861 S.E.2d 79, 89 (Va. Ct.
> App. 2021]. The defense knew when and where Roberts received
> medical treatment but did not follow-up on the information
> available to it. Saunders's failure to do so demonstrates that he
> was not diligent. Id. at 464–45[, 861 S.E.2d at 89–90]; [Va.] Code
> [Ann.] § 19.2-327.11(A)(iv)(a).

Id. at 10. Consequently, the court found Scott's analysis outside the scope of new evidence as

defined in Va. Code § 19.2-327.11 because his opinions were based on those medical records,

which "were available and could have been obtained by the exercise of diligence before

Saunders's conviction became final." Id. The court reasoned that "because Saunders could

have obtained the medical records by the exercise of diligence, he also could have obtained an expert opinion based on the records by the exercise of diligence." Id. Finally, the court found that Penny Roberts' affidavit was cumulative of Roberts' testimony that the weapon did not sound like a firearm and that he knew the weapon was not a real gun when he heard the sound it made when Saunders shot it. Id. The court found that none of the evidence qualified as "newly discovered evidence within the intendment of the actual innocence statutes," and accordingly dismissed Saunders' petition.[14] Id. at 11. Notably, the court did not address the metal fragments surgically removed from Roberts' body, which Allen claims to have delivered to the Commonwealth's Attorney.

While the petition for a writ of actual innocence was pending before the Court of Appeals, Saunders filed a petition for a writ of habeas corpus in the Supreme Court of Virginia.[15] Saunders alleged that the Commonwealth and his trial attorney committed several constitutional violations during the course of his criminal case. He pointed to the same evidence he brought forward in his petition for a writ of actual innocence, namely the metal fragments, Roberts' additional medical records, Scott's analysis, and Penny Roberts' affidavit in support of his petition. On April 6, 2023, the court denied the petition. The court construed the petition as asserting the following four claims: (1) Saunders was actually innocent; (2) the

---

[14] The Court of Appeals' online case information system states that the court received a notice of appeal to the Virginia Supreme Court on March 11, 2022. However, the record in this federal petition contains no evidence that the Virginia Supreme Court ever received or addressed Saunders' appeal, and the Commonwealth does not say whether Saunders appealed the Court of Appeals' ruling in its brief in support of the motion to dismiss. Moreover, the Virginia Supreme Court's online case information system does not show that the court has any record of an actual innocence case involving Saunders—only his direct appeal, which the court refused, and his 2021 petition for a writ of habeas corpus.

[15] The Virginia Supreme Court refused Saunders' petition for appeal and denied his petition for rehearing. See Saunders' Actual Innocence File, at 671.

Commonwealth withheld Roberts' exculpatory pretrial statement from Saunders in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); (3) the Commonwealth suppressed the portion of Roberts' medical records not disclosed in pretrial discovery, including the CT and x-ray images, in violation of <u>Brady</u>; and (4) Saunders was denied effective assistance of counsel when his trial attorney failed to seek Roberts' additional medical records, including the CT and x-ray images.[16] <u>See</u> ECF No. 13-5 at 3–8. The court did not acknowledge that Saunders had asserted a <u>Brady</u> claim based on the Commonwealth's alleged possession of and failure to disclose the metal fragments.

The court held that Saunders' actual innocence claim was barred as outside the scope of habeas corpus review in light of the separate statutory procedures available to pursue those claims under Virginia law. <u>Id.</u> at 3. As to Roberts' pretrial statements, the court held that Saunders' <u>Brady</u> claim was time barred by Va. Code § 8.01-654(A)(2). <u>Id.</u> at 4. The court further held that Saunders was not entitled to equitable tolling on the claim because the record did not show that the information in Roberts' pretrial statement was unknown to Saunders at the time of trial, pointing to Roberts' testimony on cross-examination that he did not believe the weapon was a gun based on the sound it made when fired. <u>Id.</u> at 4–5. Further, the court reasoned that even if Saunders were entitled to equitable tolling, his claim would still be untimely because he had been aware of Roberts' pretrial statements when he filed his petition for a writ of actual innocence on January 12, 2021—more than one year before he filed the petition for a writ of habeas corpus on February 7, 2022. <u>Id.</u> at 5–6.

---

[16] Saunders requested to amend his petition to add a claim related to the affidavit of Timothy "Tank" Brandon, who swore that the July 4, 2013, shooting did not occur. The court found that any claim related to Brandon's affidavit would have been untimely and denied Saunders' request to amend. ECF No. 13-5, at 9.

The court also found Saunders' claim that the Commonwealth suppressed Roberts' additional medical records, including the CT and x-ray images, untimely pursuant to Va. Code § 8.01-654(A)(2). Id. at 6. The court further held that Saunders was not entitled to equitable tolling because the Commonwealth had disclosed a 20-page subset of Roberts' medical records in pretrial discovery, including Dr. Mays' report on the CT images, and that there was no evidence to show that the Commonwealth knew that additional records existed. Id. at 6–7. The court additionally explained that even if Saunders were entitled to equitable tolling, the claim would still be untimely because he discovered the records more than one year prior to filing the petition. Id. at 7. The court found that the same holding applied to Scott's analysis because "it was derivative of the proffered medical records that existed before [Saunders'] conviction was final." Id. at 8.

The court also denied Saunders' ineffective assistance of counsel claim as untimely. The court ruled that it "was not filed within two years from the final judgment in the trial court or within one year from the final disposition of [Saunders'] direct appeal," and thus untimely under Va. Code § 8.01-654(A)(2). Id. The court did not address Saunders' contentions about the metal fragments.

Saunders filed this federal petition for a writ of habeas corpus on July 10, 2023, just over three months after the Virginia Supreme Court ruled on his state petition. See ECF No. 1. Saunders filed a motion for leave to file an amended petition, which the court granted. Order, ECF No. 9. Saunders subsequently filed an amended petition, ECF No. 10, asserting the following grounds for relief:

> 1. Actual innocence under Schlup v. Delo, 513 U.S. 298 (1985), based on his discovery of Roberts' additional medical records,

including the radiographic images, Scott's analysis, and Brandon's affidavit.

2. Prosecutorial misconduct in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), by failing to disclose to Saunders metal fragments that had been surgically removed from Roberts after the shooting.

3. Prosecutorial misconduct in violation of <u>Brady</u> by failing to disclose Roberts' exculpatory pretrial statement and by failing to correct Roberts' knowingly false trial testimony.

4. Ineffective assistance of counsel based on his trial attorney's failure to obtain Roberts' additional medical records, including the radiographic images.

<u>See</u> Am. Pet., ECF No. 10, at 16–37. The Commonwealth filed a motion to dismiss Saunders' amended petition, ECF No. 11, which the parties have fully briefed.

## II. Analysis

A federal court may grant a petitioner habeas relief from a state court judgment if the petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). However, federal courts reviewing claims that have been adjudicated on the merits in the state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)–(2). Further, the federal court must presume that the state court's factual findings are correct, and this presumption can be overcome only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The standard is difficult to meet, and it was intended to be so. <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011).

When reviewing a claim of ineffective assistance of counsel, courts also apply a highly deferential standard. A petitioner must show that (1) counsel's performance was so deficient that he was not functioning as counsel guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Thus, when reviewing a state court's assessment of an ineffective assistance of counsel claim, federal review is "doubly deferential," because the deferential standard of review under the statute overlaps with the deferential standard under Strickland. Cullen v. Pinholster, 563 U.S. 170, 190 (2011). In other words, the federal court is to afford "both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 571 U.S. 12, 15 (2013).

Deficient performance requires a showing that counsel's performance fell below "an objective standard of reasonableness" "under prevailing professional norms." Strickland, 466 U.S. at 688. The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions. Id. at 689–90. To establish prejudice under Strickland, Saunders must show that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," which means "a probability sufficient to undermine confidence in the outcome." Id. at 694.

Using the standard of review required by § 2254(a) and the criteria in Strickland, the court will address each of Saunders' claims, beginning with the issues of timeliness and procedural default.

### A. Timeliness and Procedural Default

Saunders' petition implicates the restrictions on second or successive petitions, 28 U.S.C. § 2244(b), and the one-year statute of limitations period codified at 28 U.S.C. § 2244(d). The court will address each issue in turn.

### 1.    Second or Successive Petition

28 U.S.C. § 2244(b) provides in relevant part:

> (1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.
>
> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—
>
>> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>>
>> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b). Additionally, § 2244(b)(3) provides that the applicant must request authorization from the appropriate United States Court of Appeals, here, the Fourth Circuit, before filing a second or successive application under § 2254, and sets out the associated procedures. See 28 U.S.C. § 2244(b)(3)(A)–(E). If a second or successive petition is authorized by the court of appeals, the district court must dismiss any claim presented therein unless the

petitioner satisfies the requirements of § 2244(b). See Magwood v. Patterson, 561 U.S. 320, 331 (2010) (citing 28 U.S.C. § 2244(b)(4)). Saunders did not seek authorization to file this petition from the Fourth Circuit. The issue here is whether Saunders' current § 2254 petition is second or successive within the meaning of § 2244(b). This matters because, if the answer is yes, then the court must "dismiss[] it in its entirety because he failed to obtain the requisite authorization from the Court of Appeals." Magwood, 561 U.S. at 331.

"Although Congress did not define the phrase 'second or successive,' as used to modify 'habeas corpus application under section 2254,' it is well settled that the phrase does not simply 'refe[r] to all § 2254 applications filed second or successively in time.'" In re Wright, 826 F.3d 774, 783 (4th Cir. 2016) (quoting Magwood, 561 U.S. at 331–32). Indeed, the Supreme Court "has declined to interpret 'second or successive' as referring to all § 2254 applications filed second or successively in time, even when the later filings address a state-court judgment already challenged in a prior § 2254 application." Panetti v. Quarterman, 551 U.S. 930, 944 (2007) (first citing Slack v. McDaniel, 529 U.S. 473, 487 (2000); and then citing Stewart v. Martinez-Villareal, 523 U.S. 637, 645 (1998)). In Slack, for example, the Court found that a petitioner's second § 2254 petition was not second or successive where the first petition had been dismissed for failure to exhaust state remedies. 529 U.S. at 487. And in Stewart, the Court refused to find a § 2254 petition second or successive after a previous § 2254 petition had been dismissed on a technical error. 523 U.S. at 644–45 ("To hold otherwise would mean that a dismissal of a first habeas petition for technical procedural reasons would bar the prisoner from ever obtaining federal habeas review.").

Here, Saunders' first § 2254 petition was dismissed because he failed to return the consent-to-fee form. See Saunders v. Dir. of Va. Dep't of Corr., No. 7:18-cv-176 (W.D. Va. filed Apr. 18, 2018). Saunders filed a motion for reconsideration, which the court granted. The court reopened the case and gave Saunders 30 additional days to submit the completed form. Seven months later, the court had not received any correspondence from Saunders, much less the consent-to-fee form, and dismissed the case for failure to comply with the court's previous order.

The court finds that Saunders' current petition is not second or successive within the meaning of § 2244(b). The court's order dismissing Saunders' first § 2254 petition explains that his failure "to satisfy certain financial requirements and to provide information concerning whether his petition was timely filed or his administrative remedies exhausted" served as the basis for dismissal. See id., ECF No. 7. Moreover, the court dismissed the petition without prejudice. Id. Saunders' failure to comply with these administrative minutiae will not bar the court's consideration of his current petition. See Stewart, 523 U.S. at 645; see also Benton v. Washington, 106 F.3d 162, 164–65 (7th Cir. 1996) (finding that the bar against second or successive petitions did not preclude petitioner's second § 2254 petition after his first § 2254 petition was dismissed for failure to pay a $5 filing fee). Accordingly, Saunders may proceed on this amended petition without first seeking leave from the Fourth Circuit.

### 2. Statute of Limitations

28 U.S.C. § 2244(d) mandates that a prisoner seeking federal habeas corpus relief file a petition within the one-year statute of limitations, which runs from the latest of:

27

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Saunders' amended petition implicates subparts (A) and (D).

### i.   Section 2244(d)(1)(A)

Following state court review on direct appeal, if a petitioner does not seek a writ of certiorari from the United States Supreme Court, the one-year period of limitations begins to run on the date the period for seeking review with the Supreme Court expires. Gonzalez v. Thaler, 565 U.S. 134, 150 (2012).

Here, the Supreme Court of Virginia refused Saunders' petition for appeal on October 13, 2015. He did not seek a writ of certiorari with the United States Supreme Court, meaning that the limitations period in his federal habeas case began to run 90 days later, or on January 11, 2016. See Sup. Ct. R. 13. With a start date of January 11, 2016, the statute of limitations for Saunders to file his federal habeas petition expired on January 11, 2017. Saunders did not file his first petition in this court until April 18, 2018, and he did not file this petition until July 10, 2023, more than six years after the deadline.

28

The one-year deadline for filing a federal habeas petition is suspended during the pendency of a properly filed state habeas case. 28 U.S.C. § 2244(d)(2). Before he brought this federal habeas petition, Saunders filed two state habeas corpus petitions and a state petition for a writ of actual innocence.[17] However, he did not file his first state habeas petition until June 23, 2017, five months after the one-year limitations period for federal habeas petitions had run. Considering this delay, even Saunders' first federal habeas petition, filed April 18, 2018, is untimely. Moreover, assuming that Saunders' January 12, 2021, actual innocence petition and February 7, 2022, state habeas petition were properly filed,[18] neither operates to suspend the one-year deadline for filing a federal habeas petition because they were each filed after the limitations period expired. Accordingly, each of Saunders' claims governed by § 2244(d)(1)(A) is barred as untimely.

## ii.  Section 2244(d)(1)(D)

Section 2244(d)(1)(D) provides that the one-year limitations period for a federal habeas petition begins to run on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C.

---

[17] A petition for a writ of actual innocence does not suspend the one-year limitations period to file a federal habeas petition. See Va. Code Ann. § 19.2-372.11 ("Nothing in this chapter shall constitute grounds to delay or stay any other appeals following conviction or adjudication of delinquency, or petitions to any court."); see also Bell v. True, 413 F. Supp. 2d 657, 689 (W.D. Va. 2006) ("[I]t is clear that the Virginia legislature did not intend that a pending or potential petition for a writ of actual innocence should delay or stay postconviction proceedings in this court." (citing Va. Code Ann. § 19.2-372.11)).

[18] The record does not contain the filings of Saunders' first state habeas petition, but the Commonwealth contends in its memorandum in support of the motion to dismiss that the petition was dismissed as untimely, so it is far from clear that the petition was properly filed in state court. See ECF No. 13, at 2; see also Pace v. DiGuglielmo, 544 U.S. 408, 417 (2005) ("Because the state court rejected petitioner's [state habeas] petition as untimely, it was not "properly filed," and he is not entitled to statutory tolling under § 2244(d)(2)"); Kanupp v. Piedmont Correctional Institute, 583 F. App'x 245, 246 (4th Cir. 2014) (per curiam) (finding petitioner's one-year federal habeas deadline was not tolled by state post-conviction action filed 18 months after deadline expired).

§ 2244(d)(1)(D). Though Saunders does not raise the issue explicitly, his allegations regarding the metal fragments surgically removed from Roberts could render § 2244(d)(1)(D) applicable to Claim Two, the Brady claim arising from the Commonwealth's alleged failure to disclose the metal fragments. The Fourth Circuit has explained that the due diligence requirement of § 2244(d)(1)(D) "does not require 'the maximum feasible diligence,' but it does require reasonable diligence in the circumstances." Gray v. Ballard, 848 F.3d 318, 322 (quoting Schlueter v. Varner, 384 F.3d 69, 74 (3d Cir. 2004)).

The Commonwealth's June 9, 2021, memorandum claims that Allen delivered metal fragments that had been surgically removed from Roberts' body to the Commonwealth's Attorney on the day of Saunders' trial. See Saunders' Actual Innocence File, at 535. Saunders contends that the Commonwealth's Attorney had been "in possession of, but failed to disclose to the defense, physical evidence that forensic analyse [sic] would have proven to be exculpatory and favorable evidence to Mr. Saunders." Am. Pet., ECF No. 10, at 25. Saunders further contends that he did not become aware of these fragments until he learned of the June 9, 2021, memorandum. To be sure, the trial transcript does not discuss any metal fragments associated with Saunders' case, and Roberts testified at trial that he was still awaiting surgery for the object Saunders shot into him. See ECF No. 16-6, at 51 ("I have surgery Thursday . . . . They're going to have to take it out."). And the Danville Police Department denies ever having created a property log in Saunders case. See Saunders' Actual Innocence File, at 536. But these factors do not outweigh the concerns raised by the memorandum containing Allen's recollection that he delivered the metal fragments to the Commonwealth's Attorney on the day of Saunders' trial. Additionally, the SOVA Health letter states that the

hospital's only records regarding Roberts show that each of his appointments took place before Saunders' trial. See id. at 537.

If Allen's recollection is true, then § 2244(d)(1)(D) would change the date on which Saunders' statute of limitations for his Brady claim arising from the metal fragments began to run. Specifically, Saunders alleges that he discovered the existence of the metal fragments on June 9, 2021, the date of the memorandum.[19] See Am. Pet., ECF No. 10, at 25. Saunders would have had until June 9, 2022, to file his federal habeas petition. See 28 U.S.C. § 2244(d)(1)(D) ("The limitation period shall run from . . . the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."). Saunders filed his state habeas petition in the Virginia Supreme Court on February 7, 2022,[20] which tolled the one-year limitations period on his federal habeas petition until the court ruled on April 6, 2023, at which time the federal limitations period began to run again. See ECF No. 13-5; 28 U.S.C. § 2244(d)(2). A period of 243 days passed between June 9, 2021, when Saunders alleged he learned of the metal fragments, and February 7, 2022, when he filed his state habeas petition. The limitations period was tolled during the pendency of this petition and began to run again on April 6, 2023, when the Virginia Supreme Court dismissed the petition. An additional 95 days passed from April 6, 2023, until Saunders filed this petition on July 10, 2023. In total, from the time Saunders alleges he learned of the metal

---

[19] It is more likely that Saunders first learned of the metal fragments on June 29, 2021, when the Commonwealth filed its response to Saunders' actual innocence petition. See Saunders' Actual Innocence File, at 503. This will be an issue for the parties to sort through during discovery.

[20] As discussed above, Saunders may have improperly filed this state petition on December 9, 2021, using the federal § 2254 form. The record does not contain enough information to determine whether this is true and will rely on the Virginia Supreme Court's finding that Saunders filed his petition on February 7, 2022. See ECF No. 13-5, at 1. Again, discovery will reveal the operative filing date.

fragments until he filed this federal habeas petition, 338 days passed—well within the one-year limitations period. Accordingly, if the court calculates timeliness from the date he alleges that he learned about the metal fragments, Saunders' petition is timely.

The court finds that there is conflicting evidence as to whether Allen delivered metal fragments from Roberts' body to the Commonwealth's Attorney on the day of Saunders' trial. Saunders contends that the Commonwealth committed a Brady violation by failing to disclose the metal fragments surgically removed from Roberts' body. See ECF No. 10, at 25–27. Saunders claims that, had the government disclosed this evidence, he would have sought a continuance to obtain expert analysis of the metal fragments. Id. at 26. Saunders claims that this analysis would show that the "fragment was a pellet from an airgun," entitling him to acquittal of the possession charge. Id. The Commonwealth contests this assertion, pointing to the Danville Police Department's letter that it never obtained metal fragments and Roberts' trial testimony that he still had to have surgery. However, the fact that Saunders still had to have surgery after trial does not mean that he had not already had some fragments removed. Moreover, SOVA Health's letter states that all of Roberts' appointments took place before the November 20, 2013, trial.

Pursuant to Rule 6 of the Rules Governing § 2254 Cases, the court will order the parties to engage in 120 days of discovery pursuant to the Federal Rules of Civil Procedure limited to the issue of whether the Commonwealth has, at any time, been in possession of metal fragments removed from Roberts' body. At the close of this discovery period, the court will hold an evidentiary hearing on the issue.

32

### iii. Equitable Tolling

Section 2244(d)(1)(D) applies only to the Brady claim arising from the metal fragments, and Saunders remaining claims are untimely under § 2244(d)(1)(A). Perhaps acknowledging this untimeliness, Saunders asks the court to carefully consider whether equitable tolling principles allow the court to consider his otherwise time-barred claims. See ECF No. 24 (letter from Saunders asking the court to "take its time in the research and consideration of the [e]quitable [t]olling grounds/argument"). The one-year statute of limitations is subject to tolling in appropriate cases. Holland v. Florida, 560 U.S. 631, 645 (2010). A petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Id. at 649 (quoting Pace, 544 U.S. at 418). "'The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence.'" Justus v. Clarke, 78 F.4th 97, 105 (4th Cir. 2023), cert. denied sub nom. Dotson v. Justus, 144 S. Ct. 1096 (2024) (quoting Holland, 560 U.S. at 653 (cleaned up)).

> But any invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes. To apply equity generously would loose the rule of law to whims about the adequacy of excuses, divergent responses to claims of hardship, and subjective notions of fair accommodation. We believe, therefore, that any resort to equity must be reserved for those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result.

Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000).

Saunders contends that Scott's analysis warrants equitable tolling in this case. In his analysis, Scott found that the CT images showed that the object lodged in Roberts' body could not have come from a firearm, but rather had to have come from a pellet gun. See ECF No. 10-1, at 66. Saunders also argues that the CT images themselves warrant equitable tolling because he did not know of their existence until December 2020 when he received Roberts' medical records from his mother. Relatedly, Saunders argues that his trial counsel's failure to investigate and procure these images during pretrial discovery warrants equitable tolling. Finally, Saunders claims that the Commonwealth's failure to disclose Roberts' pretrial statement that he knew the weapon was not a firearm and failure to correct Roberts' trial testimony on that point warrant equitable tolling.

The Virginia Supreme Court refused to grant relief on any of these grounds, finding that each claim was untimely. See ECF No. 13-5. However, "the question before this court is not whether the state court's determination of the [postconviction] petition's timeliness under state law was correct or incorrect, as it is well-settled that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law grounds.'" Pelzer v. Mahally, 388 F. Supp. 3d 366, 377 (M.D. Pa. 2019) (quoting Estelle v. McGuire, 502 U.S. 62, 67–68 (1991)). "Instead, the doctrine of equitable tolling 'asks whether federal courts may excuse a petitioner's failure to comply with federal timing rules, an inquiry that does not implicate a state court's interpretation of state law.'" Id. (quoting Holland, 560 U.S. at 650).

The court is not persuaded that Scott's analysis or Roberts' pretrial statements warrant equitable tolling in this case. As to the analysis, Scott rendered his expert opinion based on CT and x-ray images that Saunders did not possess at the time of trial. It may be true that, had he

received the CT and x-ray images in discovery, Saunders would have tasked an expert like Scott to prepare a similar report. But it does not follow that Scott's report, created in 2021, entitles Saunders to equitable tolling. It is too attenuated to say that, but for the absence of the CT and x-ray images, Saunders would have had Scott or a similar expert prepare an analysis of these images. This what-if scenario is not the kind of extraordinary circumstance contemplated by the Holland Court.

Nor does Roberts' pretrial statement warrant the application of equitable tolling. Saunders' means of discovery of this statement, and presentation of this statement to the court, is suspect. Saunders learned of Roberts' pretrial statement through his mother, Penny Roberts, whose affidavit Saunders submits in support of his federal habeas petition. See ECF No. 10-1, at 29–37. But the court finds that this affidavit is not reliable. It is well established that late-filed affidavits in a petition for habeas corpus are suspect. See McDowell v. Lemke, 737 F.3d 476, 484 (7th Cir. 2013) (citing Morales v. Johnson, 659 F.3d 588, 606 (7th Cir. 2011)) (finding "eleventh hour" affidavit, containing facts not alleged at trial and accompanied by no reasonable explanation, inherently suspect); Pegues v. Hooks, No. 1:19CV610, 2020 WL 85103, at *30 (M.D.N.C. Jan. 7, 2020) (denying ineffective assistance of counsel claim in part because petitioner presented nothing "beyond a self-serving and unreliable, eleventh-hour affidavit" which did not rebut evidence presented at trial). Penny Roberts' affidavit appeared for the first time in Saunders' 2021 petition for a writ of actual innocence, filed more than seven years after his 2013 trial. Penny Roberts claims that she did not know that her son's testimony about the weapon being a firearm had a significant impact on the trial court's determination of Saunders' guilt on the possession charge until Saunders called her in 2020.

Even if true, this discovery does not justify the court's consideration of a seven-year-late affidavit.

Moreover, Roberts' statement itself does not warrant equitable tolling. Penny Roberts alleges that, in a pretrial conference with the Commonwealth's Attorney, Danny Roberts said that he knew the weapon was not a real firearm. His trial testimony on this point is, at best, muddled. The following exchange on cross examination underscores the point:

> Q: Okay. Now, you said that the object you saw from the porch, it looked like a long gun?
> A: No. A .22 rifle gun. I know all guns.
> Q: Right, but you, I think, testified at preliminary hearing, "It didn't make no noise like a rifle."
> A: It went like . . . pshht (Indicating).
> Q: Yeah. Just like pshht. Yeah.
> A: No. It wasn't nothing loud. No.
> Q: Not bang like a . . . a rifle, right.
> A: No.
> Q: Understood. That's why you didn't think you'd been shot.
> A: Yeah. I was like oh, but okay. I knew I [sic] won't a real gun when I heard it.

ECF No. 13-6, at 56. The court finds that the existence of Roberts' pretrial statement that he knew the weapon was not a real gun is not sufficiently different from his trial testimony to warrant equitable tolling. On cross examination, Roberts testified that he knew the weapon was not a real gun based on the sound it made when fired. This testimony is sufficient to render any pretrial statement he made to the same effect inadequate to justify equitable tolling. At base, neither Scott' analysis nor Roberts' pretrial statement justify Saunders' late filing. Again, it cannot be said that some extraordinary circumstance stood in Saunders' way such that equitable tolling is warranted based on Roberts' pretrial statement. Claim Three remains untimely.

Saunders' allegations of constitutionally ineffective trial counsel present a more difficult question. Saunders alleges that he first learned of the existence of the CT and x-ray images in December 2020, when Penny Roberts authorized him to review her son's medical records from the July 4, 2013, incident. According to Saunders, these images show that the object lodged in Roberts' body could not have been a bullet, but instead was a domed pellet. During discovery, the Commonwealth produced Dr. Mays' report on these images but did not produce the images themselves. Dr. Mays' report relied upon and interpreted the CT images, thereby revealing their existence. According to the record as it exists at this juncture, Saunders' trial counsel never investigated Dr. Mays' report or sought to obtain the CT and x-ray images themselves.

The Supreme Court's jurisprudence on this issue is instructive. In Holland, the Court held that equitable tolling was appropriate where an attorney had failed to timely file his client's federal habeas petition and communicate with his client. 560 U.S. at 652. The attorney failed to inform his client that the Florida Supreme Court had decided his case and ignored his client's many letters repeatedly emphasizing the importance of preserving his claims for federal review. Id. These "extraordinary circumstances" of attorney misconduct justified equitable tolling. Id. at 634. Accordingly, the Court set forth the following two-pronged test: "'(1) that [petitioner] has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Id. at 649 (quoting Pace, 544 U.S. at 418). The Court emphasized, however, that this test must not be so rigidly applied as to defeat the purposes of the court's equity powers:

> The "flexibility" inherent in "equitable procedure" enables courts
> "to meet new situations [that] demand equitable intervention, and

> to accord all the relief necessary to correct . . . particular
> injustices." . . . [C]ourts of equity can and do draw upon
> decisions made in other similar cases for guidance. Such courts
> exercise judgment in light of prior precedent, but with awareness
> of the fact that specific circumstances, often hard to predict in
> advance, could warrant special treatment in an appropriate case.

Id. at 650 (citations omitted); see also Maples v. Thomas, 565 U.S. 266, 281–82 (2012)

(reaffirming the Court's holding in Holland that egregious attorney misconduct can qualify as

extraordinary circumstances worthy of equitable tolling).

Applying the Court's teachings, the record as it stands supports the equitable tolling of

Saunders' ineffective assistance of counsel claim. The evidence shows that Saunders acted with

reasonable diligence in pursuing this claim. Saunders exercised this diligence after he received

consent from Penny Roberts and obtained Roberts' medical records: acting pro se throughout,

Saunders filed a petition for a writ of actual innocence in the Virginia Court of Appeals, a state

habeas petition with the Virginia Supreme Court, and this federal habeas petition. He raised

the inaccessibility of the CT and x-ray images in each of these petitions. Moreover, he obtained

expert analysis on the images themselves to support his claims. To be sure, Saunders admits

that he had access to Dr. Mays' report during pretrial discovery, which necessarily arose from

and proved the existence of the radiographic images themselves. Accordingly, Saunders and

his trial counsel were in possession of information that should have led them to investigate

and request the underlying images. Indeed, the Virginia Court of Appeals recognized as much

when, in ruling on Saunders' petition for a writ of actual innocence, the court found that the

"defense knew when and where Roberts received medical treatment but did not follow-up on

the information available to it. Saunders's failure to do so demonstrates that he was not

diligent." ECF No. 13-1, at 10. But the court also said that its "diligence inquiry focuses on

whether Saunders made 'devoted and painstaking' efforts to obtain the evidence upon which he now relies," id. (quoting Tyler v. Virginia, 73 Va. App. 445, 464 (Va. Ct. App. 2021)), a stricter standard than "[t]he diligence required for equitable tolling purposes[, which] is reasonable diligence, not maximum feasible diligence," Holland, 560 U.S. at 653. Under these facts, it appears at this stage that Saunders has satisfied the diligence requirement.

The court finds that the record is not sufficiently developed to determine whether the failure to investigate constitutes the kind of extraordinary circumstance contemplated in Holland. It is not clear whether Saunders' trial counsel took steps to investigate these CT and x-ray images. It certainly appears from limited evidence on this point in the record that his trial counsel did not sufficiently pursue this information, which could have given rise to a defense to the possession charge under Va. Code § 18.2-308.2(A). Discovery will allow the parties to more fully flesh out the facts giving rise to Claim Two. See Holland, 560 U.S. at 651–52 (stating that an attorney's misconduct that goes beyond the "garden variety claim of excusable neglect" can satisfy the "extraordinary circumstance" requirement (quoting Irwin v. Dep't of Veterans Affs., 498 U.S. 89, 96 (1990))).

The nature of the object shown on the CT and x-ray images could have a significant effect on the legitimacy of Saunders' conviction for possession of a firearm under Va. Code § 18.2-308.2(A). Virginia law prohibits "any person under the age of 29 who was adjudicated delinquent as a juvenile 14 years of age or older at the time of the offense of a delinquent act which would be a felony if committed by an adult" from possessing a firearm. Va. Code § 18.2-308.2(A)(iii). Although § 18.2-308.2 "provides no express definition of the term 'firearm,'" the Virginia Supreme Court has held that the term "means 'any instrument

designed, made, and intended to fire or expel a projectile by means of an explosion.'" Jordan v. Commonwealth, 286 Va. 153, 157, 747 S.E.2d 799, 801 (2013) (quoting Armstrong v. Commonwealth, 263 Va. 573, 583, 562 S.E.2d 139, 145 (2002)). In Jordan, the Virginia Supreme Court noted a limitation to this definition that is relevant to Saunders' petition:

> In Startin[ v. Commonwealth], we further clarified that definition by explaining that a replica gun and a BB gun would not be sufficient to convict a person under Code § 18.2-308.2 for possession of a firearm by a convicted felon because those items were not 'designed, made, and intended to fire or expel a projectile by means of an explosion.' 281 Va. [374,] 382, 706 S.E.2d [873,] 878 [(2011)]."

It follows from the court's definition of firearm that a pellet gun, which does not file a projectile by means of an explosion, would not qualify as a firearm and thus could not support a conviction under § 18.2-308.2.[21]

Accordingly, if the CT and x-ray images prove that the projectile was a pellet from an air gun and not a bullet from a firearm, then Saunders will have raised a reasonable probability that he could not have been convicted of possession of a firearm under Va. Code § 18.2-308.2(A). The court does not have sufficient information to make that determination at this juncture, and the parties are directed to scrutinize the issue of whether Saunders' trial counsel investigated and sought to obtain the CT and x-ray images. Additionally, the parties shall seek to discover whether the contents of these images support Saunders' conviction

---

[21] In contrast, a pellet gun could qualify as a firearm in connection with the use of a firearm in commission of a felony charge under Va. Code § 18.2-53.1. See Armstrong, 263 Va. at 581–83, 562 S.E.2d at 144–45 (discussing the different definitions of firearm applicable to §§ 18.2-308.2 and 18.2-53.1 and the purpose behind the difference).

under § 18.2-308.2(A), or whether they raise reasonable doubt as to whether the weapon used by Saunders does not qualify as a firearm as the word is used in that statute.[22]

### 3. Procedural Default

In addition to their untimeliness, some of Saunders' claims are procedurally barred because the state habeas court dismissed them on a state procedural rule, which provides an adequate and independent state ground for dismissal. "Where a state court clearly and expressly bases its dismissal of a habeas claim on a state procedural rule and that rule provides an independent and adequate ground for dismissal, the petitioner will have procedurally defaulted on that habeas claim." Kent v. Kuplinski, 702 F. App'x 167, 169 (4th Cir. 2017) (per curiam) (citing Breard v. Pruitt, 134 F.3d 615, 619 (4th Cir. 1998)). "A procedural default also occurs when a habeas petitioner fails to exhaust available state court remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" Breard, 134 F.3d at 619 (quoting Coleman v. Thompson, 501 U.S. 722, 731–32 (1991)).

Here, the Virginia Supreme Court dismissed Saunders' state habeas petition as untimely. See ECF No. 13-5. Specifically, the court found that Saunders' Brady claims based on Roberts' pretrial statement and the CT images, his claim arising from Scott's analysis,[23] and his ineffective assistance claim arising from his trial counsel's failure to investigate and obtain the CT images were all time barred by Va. Code § 8.01-654(A)(2). Id. The court also noted

---

[22] Of course, Claims One and Three remain untimely.

[23] It appears that the Virginia Supreme Court treated Saunders' claim arising from Scott's analysis not as its own claim, but instead as a claim derived from the Brady claim based on the CT images. See ECF No. 13-5, at 7–8. Regardless, the court dismissed any claim arising from Scott's analysis as untimely pursuant to Va. Code § 8.01-654(A)(2). Id. at 8.

that Saunders had sought to amend his petition to include claims related to Brandon's affidavit, but the court denied leave to amend because, if brought, the claim would be untimely pursuant to Va. Code § 8.01-654(A)(2). See ECF No. 13-5, at 9. The court also cited Rule 5:7(e) of the Rules of the Supreme Court of Virginia, which prohibits amendment to add a claim where the statute of limitations has expired. Id.

Section 8.01-654(A)(2) provides, in relevant part, that "[a] habeas corpus petition attacking a criminal conviction or sentence shall be filed within two years from the date of final judgment in the trial court or within one year from either final disposition of the direct appeal in state court or the time for filing such appeal has expired, whichever is later." Va. Code Ann. § 8.01-654(A)(2). In the Fourth Circuit, "many courts have held [that] Virginia Code § 8.01-654(A)(2) constitutes an adequate and independent state-law procedural rule, as it is a statutory rule that is not tied to the federal Constitution." Baker v. Clarke, 95 F. Supp. 3d 913, 917–18 (E.D. Va. 2015) (citing Sparrow v. Dir., Dep't of Corr., 439 F. Supp. 2d 584, 587–88 (E.D. Va. 2006)); see also Williams v. French, 146 F.3d 203, 209 (4th Cir. 1998) ("Such a rule is adequate if it is regularly or consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 . . . (1988), and is independent if it does not 'depend[] on a federal constitutional ruling,' Ake v. Oklahoma, 470 U.S. 68, 75 . . . (1985)."). Accordingly, Saunders' claims based on Roberts' pretrial statement, the CT images, and Scott's analysis are procedurally defaulted.

Notably, the Virginia Supreme Court did not address Saunders' Brady claim based on the metal fragments lodged in Roberts' body even though Saunders explicitly raised the issue in his petition. See ECF No. 13-2, at 7; ECF No. 13-4, at 9. To be sure, the court said that

42

Saunders "asserts the Commonwealth suppressed physical evidence that would have demonstrated Roberts was struck by an air pellet gun, not a firearm." ECF No. 13-5, at 6. But the remainder of the court's analysis on this claim indicates that the court was discussing the CT images, not the metal fragments:

> ... [Saunders] asserts the Commonwealth suppressed physical evidence that would have demonstrated Roberts was struck by an air pellet gun, not a firearm. [Saunders] contends he recently discovered this evidence when he received the medical records provided by Penny after their phone call in October 2020. Although [Saunders] acknowledges the Commonwealth submitted twenty pages of Roberts' medical records during pre-trial discovery, he contends additional medical records, including the CT images, were improperly withheld by the Commonwealth. [Saunders] asserts he would not have been found guilty of possession of a firearm if the Commonwealth had not withheld the CT images.
>
> In support of this claim, [Saunders] attached the medical records he contends he obtained from Penny. The medical records include several CT images appearing to show an object embedded in Roberts' chest. Other records included impressions from various medical providers, including physician notes from Dr. Stacey Williams noting that "no bullet seen" and listing Roberts' report of a "gun shot wound to the chest." Another radiologist report noted "no acute findings" and a possible unrelated pancreatic duct issue. Nursing notes listed Roberts' injury as a "GSW" and stated Roberts could not remember the type of gun. [Saunders] also attached a form affidavit signed by Penny on December 9, 2020, in which she stated she received the medical records, including the CT images, from her son's treating facilities and that she sent such medical records to [Saunders]."

Id. Although the court initially discussed "physical evidence," the court never mentioned metal fragments. Rather, the court's discussion centered completely on the CT images and other medical records. Although Saunders raised a Brady claim based on the metal fragments, the court never addressed it. Moreover, it cannot be said that the state court would now find

Saunders' Brady claim arising from the metal fragments (Claim Two) procedurally barred because he raised the claim in his 2021 state habeas petition. See Breard, 134 F.3d at 619. This claim is therefore exhausted but not procedurally defaulted.

Each of Saunders claims—except the Brady claim based on the metal fragments—is procedurally defaulted. "Two showings excuse a procedural default: a defendant's demonstration of 'either cause and actual prejudice or that he is actually innocent.'" United States v. McKinney, 60 F.4th 188, 193 (4th Cir. 2023) (quoting Bousley v. United States, 523 U.S. 614, 622 (1988)). Here, Saunders claims that cause and prejudice exist such that his procedural default may be excused. Further, Saunders asserts that he is actually innocent of the possession charge (Claim One). The court will address each of these arguments in turn. See Dretke v. Haley, 541 U.S. 386, 393–94 (2004) ("[A] federal court faced with allegations of actual innocence . . . must first address all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default.").

### i.     Cause and Prejudice

"The existence of cause for procedural default 'ordinarily turn[s] on whether [a] petitioner can show that some objective factor external to the defense' impeded [his] efforts to comply with the State's procedural rule." Farabee v. Clarke, 967 F.3d 380, 395–96 (4th Cir. 2020) (quoting Mueller v. Angelone, 181 F.3d 557, 585 (4th Cir. 1999)). The court will address each claim to see whether circumstances exist to excuse his late filing under Va. Code § 8.01-654(A)(2).

There is no cause to excuse Saunders' Brady claim based on Roberts' pretrial statement (Claim Three) or any claim arising from Brandon's affidavit.[24] As to Roberts' pretrial statement, Saunders' trial counsel elicited on cross examination Roberts' testimony that he knew the weapon was not a firearm based on the sound it made when Saunders fired it. Additionally, Saunders only submitted evidence of Roberts' pretrial statement through Penny Roberts' affidavit, which she signed in 2021—more than seven years after Saunders' trial. Roberts' testimony at trial and the unreliability of the source of Roberts' pretrial statement show that there is no reason to depart from the Virginia Supreme Court's ruling that Saunders' claim arising from Roberts' pretrial statement is untimely. Saunders' claim related to Brandon's affidavit is likewise not excused from its untimeliness—Saunders' only proposed justification for the untimeliness of this claim is that he only established contact with Brandon in 2022, but that is an insufficient basis to excuse untimeliness because Saunders does not identify an external factor that impeded him from establishing contact with Brandon earlier.

Saunders argues that the procedural default on his ineffective assistance of counsel claim is excused by the fact that he was not aware of the existence of the CT images until December 2020 when he reviewed Roberts' medical records. He explains that he did not know about the CT images because his trial counsel did not conduct an adequate investigation into his case. Specifically, he argues that his trial counsel did not investigate Dr. Mays' report on the CT images. He contends that, if he had known that Roberts' medical records included CT images, he would have been able to show that the object lodged in Roberts' body was not a

---

[24] Saunders only raises Brandon's affidavit in connection with Claim One, his actual innocence gateway claim. Nevertheless, the court will address it in connection with his cause and prejudice argument.

bullet, but rather a pellet shot from an air gun. Saunders asserted this claim in his 2021 state habeas petition, and the Supreme Court of Virginia dismissed it as untimely pursuant to Va. Code § 8.01-654(A)(2).

Saunders' cause argument is premised on the inadequacy of his trial counsel's performance during pretrial discovery. Saunders claims that his trial counsel was constitutionally ineffective for failing to investigate Dr. Mays' report and discover the CT images.

Criminal defendants have a Sixth Amendment right to effective legal assistance. Strickland v. Washington, 466 U.S. 668, 687 (1984). To establish that counsel's assistance was not reasonably effective, a defendant must satisfy a two-prong analysis: he must show both that (1) counsel's performance fell below an objective standard of reasonableness; and (2) he was prejudiced by counsel's alleged deficient performance. Id. at 669.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690–91; see also Williams v. Stirling, 914 F.3d 302, 313 (4th Cir. 2019) ("[A reviewing] court must consider not only the quantum of evidence already known to counsel but also whether the known evidence would lead a reasonable attorney to investigate further." (brackets in original) (quoting Wiggins v. Smith, 539 U.S. 510, 527 (2023))).

When considering the reasonableness prong of <u>Strickland</u>, courts apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> at 689. The court must judge counsel "on the facts of the particular case," and assess counsel's performance "from counsel's perspective at the time." <u>Id.</u> The reviewing court must not rely upon "the distorting effects of hindsight," but must presume that counsel's decisions and actions fell within the wide range of reasonable strategy decisions. <u>Id.</u> at 689–90. To satisfy the prejudice prong of <u>Strickland</u>, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the proceeding would have been different. <u>Id.</u> at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

"If attorney error amounts to constitutionally ineffective assistance of counsel under the standard established in <u>Strickland</u>, the Sixth Amendment dictates that the attorney's error must be imputed to the state." <u>Burket v. Angelone</u>, 208 F.3d 172, 189 (4th Cir. 2000) (citing <u>Coleman</u>, 501 U.S. at 754). Saunders "may establish cause to excuse his procedural default by showing attorney error that satisfies the standard set forth in <u>Strickland</u>." <u>Id.</u> (citing <u>Coleman</u>, 501 U.S. at 752–54).

The court finds that the record is insufficiently developed at this juncture to determine whether Saunders has sufficiently demonstrated cause to excuse procedural default on his ineffective assistance of counsel claim. As it stands, the record shows that although the Commonwealth disclosed Dr. Mays' report before trial, Saunders was not aware of the report and his trial counsel did not pursue any investigation into the report or its underlying medical records, namely, the CT and x-ray images. But the court needs more information about the

nature of Saunders' trial counsel's work on the case, including any investigation he undertook into the materials provided by the Commonwealth in pretrial discovery.

As discussed with respect to equitable tolling, the investigative conduct of Saunders' counsel before trial could have a significant impact on whether Saunders is able to demonstrate actual prejudice such that excuse of his procedural default is appropriate. Where ineffective assistance is the basis for procedural default, courts look to the prejudice requirement set forth in Strickland to determine whether the default can be set aside. See Burket, 208 F.3d at 189. Where a defendant proceeds to trial, the prejudice prong requires the petitioner to show that "there is a reasonable probability that, but for [the errors], the result of the proceeding would have been different." Id. at 189 n.17 (quoting Strickland, 466 U.S. at 694). If the CT and x-ray images show that Saunders shot Roberts with a pellet from an air gun and not a bullet from a firearm, then Saunders may be able to show that there is a reasonable probability that, had his counsel discovered the CT and x-ray images and presented them at trial, the outcome would have been different. See id.; see also Startin, 281 Va. at 382, 706 S.E.2d at 878; Jordan, 286 Va. at 157, 747 S.E.2d at 801.

### ii. Actual Innocence

Through Claim One, Saunders seeks to overcome the procedural bars to the court's consideration of his constitutional claims. The Supreme Court has recognized a miscarriage-of-justice exception to procedural default that seeks to "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." Schlup v. Delo, 513 U.S. 298, 324 (1985). A credible claim of actual innocence serves as a "gateway through which a habeas petitioner must pass to have his

otherwise barred constitutional claim considered on the merits." Id. at 315. Such a claim must be supported by new reliable evidence.

> Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim.

Id. at 316. "[T]he Schlup standard is demanding. The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court also is satisfied that the trial was free of nonharmless constitutional error.'" McQuiggin v. Perkins, 569 U.S. 383, 401 (2013) (quoting Schlup, 513 U.S. at 316). The petitioner "'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" Id. at 399 (quoting Schlup, 513 U.S. at 327).

Most of Saunders' evidence does not satisfy the Schlup standard—neither Roberts' pretrial statement, Scott's analysis, the CT images, nor Brandon's affidavit constitute new evidence. Accordingly, no claims based on those pieces of evidence will pass through the actual innocence gateway. Additionally, Saunders' Brady claim based on the metal fragments is not procedurally defaulted, so Saunders need not take advantage of the actual innocence gateway to preserve Claim Two.

### B. Merits of Claims

At this stage, the court does not have sufficient information to decide the merits of Claims Two and Four—the Brady claim arising from the metal fragments and the ineffective assistance of counsel claim based on trial counsel's failure to sufficiently investigate the CT and x-ray images. Accordingly, the court will deny the motion to dismiss on these counts and

wait to address the merits of these claims until discovery has closed and the court has held the evidentiary hearing.

### III.    Appointment of Counsel

Considering that the parties will conduct discovery and the court will hold an evidentiary hearing, the court finds it necessary to appoint counsel for Saunders. Rule 8(c) of the Rules Governing Habeas Corpus Cases Under Section 2254 requires that "[i]f an evidentiary hearing is warranted, the judge must appoint an attorney to represent a petitioner who qualifies to have counsel appointed under 18 U.S.C. § 3006A." Rule 6(a) likewise provides that "[i]f necessary for effective discovery, the judge must appoint an attorney for a petitioner who qualifies to have counsel appointed under 18 U.S.C. § 3006A."

In relevant part, § 3006A provides that "[w]henever the United States magistrate judge or the court determines that the interests of justice so require, representation may be provided for any financially eligible person who . . . is seeking relief under section 2241, 2254, or 2255 of title 28."[25] 18 U.S.C. § 3006A(a)(2)(B). Given that Saunders has been imprisoned since 2013, the court finds that he is financially eligible for representation. Accordingly, the court will appoint the Federal Public Defender to represent Saunders pursuant to Rules 6 and 8 of the Rules Governing Habeas Corpus Cases Under Section 2254 and 18 U.S.C. § 3006A(a)(2)(B).

---

[25] As required, the Western District of Virginia has developed a plan implementing § 3006A. See WDVA Criminal Justice Act Plan, https://www.vawd.uscourts.gov/criminal-justice-act/cja-general-information (last visited Aug. 9, 2024). The court's appointment of counsel in this case comports with that plan.

## IV. Certificate of Appealability

No certificate of appealability is necessary at this juncture because the court has not issued a final order. See Rule 11(a) of the Rules Governing Habeas Corpus Cases Under Section 2254.

## V. Conclusion

For the reasons stated above, the motion to dismiss is **GRANTED** as to Claims One and Three and **DENIED** as to Claims Two and Four. The parties are **DIRECTED** to engage in 120 days of discovery on the issues raised by Claims Two and Four. The parties are further **DIRECTED** to contact the clerk to schedule an evidentiary hearing after the close of discovery. The court **APPOINTS** the Federal Public Defender to represent Saunders during the remaining pendency of this action.

The clerk shall file Saunders' Actual Innocence File on the docket. An appropriate order will be entered.

Entered: September 5, 2024

Michael F. Urbanski
Senior United States District Judge