IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERKS OFFICE U.S. DIST. COURT
LYNCHBURG, VA
FILED
June 04, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ B. McAbee
DEPUTY CLERK

JAMAL KEMO SAUNDERS, a/k/a )
FOREVER AL-MANI HAMILTON, )
                    )
                    )   **Case No. 7:23-cv-416**
      Petitioner,      )
                    )
v.                    )   **By:    Michael F. Urbanski**
                    )   **Senior United States District Judge**
DIRECTOR HAROLD CLARKE, )
                    )
      Respondent      )
                    )

## SUPPLEMENTAL MEMORANDUM OPINION

Jamal Kemo Saunders, an inmate proceeding pro se, has filed a petition for habeas corpus relief pursuant to 28 U.S.C. § 2254. Am. Pet., ECF No. 10. Respondent filed a motion to dismiss, and on September 25, 2024, the court dismissed two of Saunders' claims and allowed two claims to go forward. The court also appointed counsel to represent Saunders and ordered the parties to conduct limited discovery. Mem. Op. and Order, ECF Nos. 27, 28. The court held an evidentiary hearing on June 17, 2025. Following the hearing, the court ordered the parties to submit additional briefing and they have done so. ECF Nos. 45, 46, 48. Having considered the record and the briefing, the court **DISMISSES** Saunders' petition.

Saunders challenges his conviction for "possessing a firearm under the age of 29 with a prior violent juvenile conviction" in violation of Va. Code § 18.2-308.2(A) (hereinafter "possession of a firearm").[1] Although the statute provides no express definition of "firearm,"

---

[1] This petition is the second petition Saunders has filed in this court, but it is not barred as second or successive under 28 U.S.C. § 2244(b) because his previous petition was dismissed without prejudice for failing to submit a consent-to-fee form. See Mem. Op., ECF No. 27 at 25–27.

the Supreme Court of Virginia has held that a conviction for possession of a firearm under the statute may be sustained by showing that a person subject to the statute "possessed an instrument which was designed, made, and intended to expel a projectile by means of an explosion." Armstrong v. Commonwealth, 263 Va. 573, 583, 562 S.E.2d 139, 145 (2002). However, a weapon, such as a BB gun, air rifle, or pellet gun, that does not expel a projectile by means of an explosion, does not meet the definition of firearm under the statute. Startin v. Commonwealth, 281 Va. 374, 382, 706 S.E.2d 873, 878 (2011) (citing Holloman v. Commonwealth, 221 Va. 196, 197, 269 S.E.2d 356, 357 (1980) and Armstrong, 263 Va. at 583, 562 S.E.2d at 145). "Whether the object is a firearm that was designed, made, and intended to fire or expel a projectile by means of an explosion is a question of fact that may be proven by circumstantial evidence." Speller v. Commonwealth, 69 Va. App. 378, 395, 819 S.E.2d 848, 856 (2018).

Saunders argues that the weapon used in this shooting was a pellet gun and that had evidence that it was a pellet gun been presented at trial, he would not have been convicted on the possession of a firearm charge. In his two remaining claims, he asserts (1) his constitutional rights were violated before and during trial when the Commonwealth withheld evidence that metal fragments removed from the victim's body came from a pellet gun; and (2) his attorney provided ineffective assistance of counsel when he did not subpoena the victim's complete medical records which Saunders contends would have shown that the weapon used was a pellet gun rather than a firearm.

2

## I. Background

At trial, which occurred on November 20, 2013, Danny Roberts testified that on the afternoon of July 4, 2013, he and Timothy "Tank" Brandon were walking down the street in Danville, Virginia.[2] They passed Saunders standing on the front porch of a nearby house and Saunders called out to Roberts, "I'm going to shoot you in the face." Saunders pointed a weapon at Roberts, which appeared to Roberts to be a .22 caliber long rifle, and fired twice, hitting Roberts in the chest. Trial Tr., ECF No. 13-6 at 42, 44–45. On cross examination, Saunders' counsel, Jason Eisner, elicited the following testimony from Roberts about the shooting:

> Q: Okay. Now, you said that the object you saw from the porch, it looked like a long gun?
>
> A: No. A .22 rifle gun. I know all guns.
>
> Q: Right, but you, I think, testified at preliminary hearing, "It didn't make no noise like a rifle."
>
> A: It went like . . . pshht (Indicating).
>
> Q: Yeah. Just like pshht. Yeah.
>
> A: No. It wasn't nothing loud. No.
>
> Q: Not bang like a . . . a rifle, right.
>
> A: No.
>
> Q: Understood. That's why you didn't think you'd been shot.
>
> A: Yeah. I was like oh, but okay. I knew I [sic] won't [sic] a real gun when I heard it.

---

[2] Roberts passed away in 2016 during a home fire. See ECF No. 10-1 at 29.

Id. at 56. The Commonwealth objected to Roberts' final answer in the above exchange, which the court sustained, finding Roberts' answer non-responsive. Id. Saunders' counsel did not pursue this line of questioning any further.

Roberts did not realize he had been shot because he "didn't even feel nothing." Id. at 45. When he got home, his girlfriend told him he was bleeding and he "patched it up." Roberts did not call the police or seek medical care at that time. Id. at 46. Four days later, on July 8, 2013, Roberts went to the emergency room because "[t]hey made me go." Id. at 49. Roberts testified that he had surgery planned for an upcoming Thursday, because "[t]hey're going to have to take it out." Id. at 51.[3]

Saunders presented an alibi defense, calling two witnesses who testified that he was at a church fish fry and with his girlfriend for most of the afternoon when the shooting occurred. Trial Tr., ECF No. 13-6 at 83–95. Regarding the possession of a firearm charge, Saunders' attorney argued to the court that based on Roberts' testimony that he felt nothing when he was shot, that he did not hear a loud bang from the gun, and that his wound was not serious, the weapon used to shoot Roberts was not a firearm under the statute, but rather a pellet gun or air rifle. Id. at 70–74.

Notwithstanding counsel's argument, the court convicted Saunders on all three charges and on January 16, 2014, sentenced him to five years on the possession of a firearm charge,

---

[3] After Roberts went to the emergency room, Officer R. L. Compton of the Danville Police Department went to the Danville Regional Medical Center to speak with him and initiated an investigation into the shooting. Am. Pet., ECF No. 10-1 at 90. Saunders subsequently was indicted for malicious wounding, use of a firearm in commission of a felony, and possession of a firearm related to the events of July 4, 2013. Saunders pled not guilty and waived his right to trial by jury, agreeing instead to a bench trial. Saunders also was indicted for a hit and run that occurred on June 4, 2013, and for events that occurred on July 5, 2013, but those charges arose from events unrelated to those giving rise to this petition.

three years on the use of a firearm in the commission of a felony charge, and eight years on the malicious wounding charge, with the sentences to run consecutively. The court suspended five of the eight years imposed on the malicious wounding charge for a total period of eleven years of active incarceration. The court imposed an eighteen-month term of supervised probation. Sentencing Order, ECF No. 13-7 at 80–83.

Saunders was released from custody on or around June 17, 2025, and began serving his eighteen-month term of supervised probation. Evid. H'r'g Tr., ECF No. 52 at 161–62. At some point in late 2025, Saunders was arrested on several charges and was in custody for a time but has since been released. See Notices Regarding Custody Status, ECF Nos. 50, 53.

## II. Post-Conviction Proceedings

On February 7, 2014, Saunders appealed his conviction for possession of a firearm to the Virginia Court of Appeals. Notice of Appeal, ECF No. 13-7 at 77–78. Saunders argued that the evidence presented at trial did not establish that the weapon qualified as a firearm under Va. Code § 18.2-308.2(A) and that, instead, the evidence left open the reasonable hypothesis that the weapon was an air-propelled gun, such as a pellet gun. The Court of Appeals rejected Saunders' argument and affirmed his conviction on January 27, 2015. Mem. Op., ECF No. 13-7 at 93–104.

Saunders filed a petition for appeal with the Supreme Court of Virginia on February 27, 2015, ECF No. 13-9 at 1–20, which was refused on October 13, 2015. ECF No. 13-10. Saunders did not seek a writ of certiorari in the United States Supreme Court, and the time to do so expired on January 11, 2016. See Sup. Ct. R. 13.

5

Saunders filed his first state habeas petition in the Danville Circuit Court on June 23, 2017. The court dismissed the petition on March 23, 2018, concluding that it was time-barred.[4] Saunders did not appeal this dismissal.

Next, Saunders filed a federal habeas petition in this court. See Saunders v. Dir. of Va. Dep't of Corr., No. 7:18-cv-176 (W.D. Va. filed Apr. 18, 2018). On May 24, 2018, the court dismissed the petition without prejudice because Saunders did not return the consent-to-fee form as required by the court's previous order. Id., ECF No. 4. The court later vacated this order on a motion for reconsideration filed by Saunders and gave him 30 additional days to file the consent-to-fee form. Id., ECF No. 6. Saunders never filed the form, and the court again dismissed the petition without prejudice on October 24, 2019. Id., ECF No. 7.

On January 12, 2021, Saunders filed a petition for a writ of actual innocence in the Virginia Court of Appeals pursuant to the procedures set forth in Va. Code §§ 19.2-327.10–19.2-327.14. The Court of Appeals dismissed Saunders' petition on February 9, 2022. Op., ECF No. 13-1. Saunders appealed the denial and on September 28, 2022, the Virginia Supreme Court refused the petition for appeal. Order, Actual Innocence File at 668–71.

While the petition for a writ of actual innocence was pending before the Court of Appeals, Saunders filed a second petition for a writ of habeas corpus in the Supreme Court of Virginia on December 9, 2021. Saunders alleged that the Commonwealth violated several of his rights and that his trial attorney provided ineffective assistance during the course of his

---

[4] Though the Commonwealth discusses this petition in its motion to dismiss, ECF No. 13, at 2, the record does not include any documentation associated with this petition. The Danville Circuit Court's online case information website shows that Saunders filed this petition on June 23, 2017, and that the court dismissed the petition on March 23, 2018, but does not provide access to the docket or to the basis for dismissal.

6

criminal case. Pet., ECF No. 13-2. On April 6, 2023, the Supreme Court of Virginia dismissed the petition. Op., ECF No. 13-5. It construed Saunders' first claim as one for actual innocence and dismissed it as improperly brought in the habeas petition. Id. at 3. The court dismissed the remainder of Saunders' claims as untimely and found that he was not entitled to equitable tolling of the statute of limitations. Id. at 3–8.

On July 10, 2023, Saunders filed his petition for relief in this court and filed an amended petition on August 25, 2023. ECF Nos. 1, 10. Saunders asserted four grounds for relief:

> 1. Actual innocence under Schlup v. Delo, 513 U.S. 298 (1985), based on his discovery of Roberts' additional medical records, including radiographic images, an expert's analysis of the radiographic images, and an affidavit signed by "Tank" Brandon.
>
> 2. Prosecutorial misconduct in violation of Brady v. Maryland, 373 U.S. 83 (1963), caused by the Commonwealth's failure to disclose to Saunders metal fragments that had been surgically removed from Roberts after the shooting.
>
> 3. Prosecutorial misconduct in violation of Brady caused by the Commonwealth's failure to disclose Roberts' exculpatory pretrial statement and by failing to correct Roberts' knowingly false trial testimony.
>
> 4. Ineffective assistance of counsel based on his trial attorney's failure to obtain Roberts' additional medical records, including the radiographic images of his chest and abdomen.

Am. Pet., ECF No. 10, at 16–37.

In its previous memorandum opinion, the court dismissed as untimely Saunders' actual innocence claim, which he asserted as a means to establish a gateway for the court to consider his ineffective assistance of counsel claim on the merits under Schlup. See Am. Pet., ECF No. 10 at 16–18; Mem. in Support of Reply to Mot. to Dismiss, ECF No. 23 at 3–4; and Mem. Op., ECF No. 27 at 48–49. As discussed below, having considered the evidence presented at

the evidentiary hearing, the court amends its previous opinion and order and finds that Saunders has made a showing of actual innocence for the purpose of establishing a gateway for the court to review his ineffective assistance claim on the merits.[5]

The court also dismissed as untimely Saunders' Brady claim based on the failure to disclose Roberts' exculpatory pretrial statement and the failure to correct his allegedly false trial testimony. Mem. Op., ECF No. 27 at 23–48. The record continues to support dismissal of this claim.

The court also found that fact issues precluded a finding of whether the Brady claim based on the failure to disclose metal fragments was untimely under 28 U.S.C. § 2244(d)(1)(D). The court further found that the record was insufficiently developed to determine whether Saunders' ineffective assistance of counsel claim was subject to equitable tolling of the statute of limitations and, if so, whether it was procedurally defaulted. In addition, the court found that even if Saunders could overcome the procedural barriers to the remaining claims, it did not have sufficient information to determine the merits of the claims. Mem. Op., ECF No. 27 at 43–50. Having considered the record and the evidence presented at the evidentiary hearing, the court now resolves these issues.

### III. Analysis

### A. Mootness

At the end of the evidentiary hearing, the court directed the parties to brief the issue of mootness because Saunders had been released from custody prior to the hearing, and they

---

[5] Because the court finds that Saunders met the actual innocence threshold based on the late-discovered medical records, it does not discuss Saunders' arguments regarding Brandon's affidavit.

8

did so. ECF Nos. 45, 48. Also at the evidentiary hearing, there was discussion about whether Saunders was serving a term of probation on the possession of a firearm charge. Evid. H'r'g Tr., ECF No. 52 at 200–01.

A close reading of the state sentencing order indicates that Saunders was not serving a term of probation upon his release on the possession of a firearm charge. The state trial court suspended five years of the eight-year sentence on the malicious wounding conviction but did not suspend any of the five-year sentence on the possession of a firearm conviction. Sentencing Order, ECF No. 13-7 at 81. The eighteen-month term of supervised probation is part of the "Suspended Sentence Conditions." Id. at 82. Therefore, because the sentence on the possession of a firearm charge was not suspended, the term of supervised probation does not apply to that conviction, and Saunders has fully satisfied his sentence on the possession of a firearm conviction.

Even though Saunders has been released from custody and is not serving a term of probation on the possession of a firearm conviction, this court retains jurisdiction of his case and his claim is not moot. The Supreme Court has held that "once the federal jurisdiction has attached in the District Court, it is not defeated by the release of the petitioner prior to completion of proceedings on such application." Carafas v. LaVallee, 391 U.S. 234, 238 (1968). Thus, because Saunders was in custody at the time he filed his habeas petition, the court continues to have jurisdiction over this matter. Id.; Plymail v. Mirandy, 8 F.4th 308, 314 (4th Cir. 2021).

Nor did Saunders' claim become moot upon completion of his sentence because the "existence of certain 'collateral consequences' to the petitioner's conviction prevents a habeas

9

petition from becoming moot." Plymail, 8 F.4th at 315 (quoting Carafas, 391 U.S. at 237–38). The mere possibility of consequences collateral to the imposition of the sentence is sufficient to justify consideration of the merits of the claim, and the court presumes that collateral consequences exist. Id. (citing Pollard v. United States, 352 U.S. 354, 358 (1957) and Sibron v. State of N.Y., 392 U.S. 40, 55 (1968)). See also Evitts v. Lucey, 469 U.S. 387, 391, n.4 (1985) (finding case not moot when collateral consequences of petitioner's conviction remain, "including the possibility that the conviction would be used to impeach testimony he might give in a future proceeding and the possibility that it would be used to subject him to persistent felony offender prosecution if he should go to trial on any other felony charges in the future.") Accordingly, even though Saunders is not in custody and is not serving a term of probation, his claims are not moot and the court will consider them.

### B. Standard of Review

A federal court may grant a petitioner relief from a state court judgment if the petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). However, federal courts reviewing claims that have been adjudicated on the merits in the state court may grant relief on such a claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)–(2). A state court's decision is "contrary to" clearly established federal law when it "'applies a rule that contradicts the governing law set forth' by the United States Supreme Court, or 'confronts a set of facts that are materially indistinguishable from a decision

of ... [the Supreme] Court and nevertheless arrives at a result different from ... [that] precedent[.]'" Powell v. Kelly, 562 F.3d 656, 664 (4th Cir. 2009) (quoting Williams v. Taylor, 529 U.S. 362, 405–06 (2000)). "A state court's decision involves an 'unreasonable application' of clearly established federal law under § 2254(d)(1) 'if the state court identifies the correct governing legal rule from ... [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.'" Id. (quoting Williams, 529 U.S. at 407.) "The state court's application of clearly established federal law must be 'objectively unreasonable,' and 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Robinson v. Polk, 438 F.3d 350, 355 (4th Cir. 2006) (quoting Williams, 529 U.S. at 411.)

### C. Statute of Limitations

A prisoner seeking federal habeas corpus relief from a state court conviction is subject to a one-year statute of limitations period, which runs from the latest of the date on which (A) the judgment becomes final by the conclusion of direct review; (B) any state-created impediment to filing a petition is removed; (C) the United States Supreme Court newly recognizes the right asserted; or (D) the claim's factual predicate was or could have been discovered through due diligence. 28 U.S.C. § 2244(d)(1). If a petitioner declines to seek certiorari in the Supreme Court of the United States after exhausting all avenues of direct review in state court, the petitioner's judgment becomes final after ninety days. Gonzales v. Thaler, 565 U.S. 134, 149–50 (2012).

11

The Supreme Court of Virginia refused Saunders' petition for appeal on October 13, 2015. He did not seek a writ of certiorari with the United States Supreme Court, meaning that the limitations period in his federal habeas case began to run 90 days later, or on January 11, 2016. See Sup. Ct. R. 13. With a start date of January 11, 2016, the statute of limitations for Saunders to file his federal habeas petition expired on January 11, 2017. Saunders did not file his first petition in this court until April 18, 2018. It was dismissed without prejudice and he did not file this petition until July 10, 2023, more than six years after the deadline.

The one-year deadline for filing a federal habeas petition is suspended during the pendency of a properly filed state habeas case. 28 U.S.C. § 2244(d)(2). Before he brought this federal habeas petition, Saunders filed two state habeas corpus petitions and a state petition for a writ of actual innocence.[6] However, he did not file his first state habeas petition until June 23, 2017, five months after the one-year limitations period for federal habeas petitions had run. Considering this delay, even Saunders' first federal habeas petition, filed April 18, 2018, is untimely. Moreover, assuming that Saunders' January 12, 2021, actual innocence petition and February 7, 2022, state habeas petition were properly filed,[7] neither operates to

---

[6] A petition for a writ of actual innocence does not suspend the one-year limitations period to file a federal habeas petition. See Va. Code Ann. § 19.2-372.11 ("Nothing in this chapter shall constitute grounds to delay or stay any other appeals following conviction or adjudication of delinquency, or petitions to any court."); see also Bell v. True, 413 F. Supp. 2d 657, 689 (W.D. Va. 2006) ("[I]t is clear that the Virginia legislature did not intend that a pending or potential petition for a writ of actual innocence should delay or stay postconviction proceedings in this court." (citing Va. Code Ann. § 19.2-372.11)).

[7] The record does not contain the filings of Saunders' first state habeas petition, but the Commonwealth contends in its memorandum in support of the motion to dismiss that the petition was dismissed as untimely, so it is far from clear that the petition was properly filed in state court. See ECF No. 13, at 2; see also Pace v. DiGuglielmo, 544 U.S. 408, 417 (2005) ("Because the state court rejected petitioner's [state habeas] petition as untimely, it was not "properly filed," and he is not entitled to statutory tolling under § 2244(d)(2)"); Kanupp v. Piedmont Correctional Institute, 583 F. App'x 245, 246 (4th Cir. 2014) (per curiam) (finding petitioner's one-year federal habeas deadline was not tolled by state post-conviction action filed 18 months after deadline expired).

12

suspend the one-year deadline for filing a federal habeas petition because they were each filed after the limitations period expired. Thus, as the court recognized in its previous opinion, each of Saunders' claims governed by § 2244(d)(1)(A) is barred as untimely. Mem. Op., ECF No. 27 at 29.

**(1) Brady Claim**

Saunders argues that his Brady claim is timely under 28 U.S.C. § 2241(d)(1)(D), which provides that the statute of limitations does not begin to run until the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence. He asserts that he did not learn of the facts underlying his Brady claim until the Commonwealth filed a response to his actual innocence petition on June 9, 2021.

In its previous memorandum opinion, the court noted that if Saunders did not learn of the facts underlying his Brady claim until June 9, 2021, and the one-year time limit was tolled while his second state habeas petition was pending in state court, then his federal habeas petition was timely. Mem. Op., ECF No. 27 at 29–32. One goal of the evidentiary hearing was to determine whether the Commonwealth was in possession of metal fragments removed from Roberts' body, and if so, at what point in the proceedings could Saunders have discovered the existence of the fragments through the exercise of due diligence. However, following the evidentiary hearing and after considering all the evidence in the record, the court determines that even if the Brady claim was timely filed, Saunders cannot show that the Commonwealth withheld exculpatory evidence and therefore, the claim must be dismissed.

In Brady, 373 U.S. at 87, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the

13

Case 7:23-cv-00416-MFU-JCH  Document 54  Filed 06/04/26  Page 14 of 36
Pageid#: 1392

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Thus, to prevail on a Brady claim, a petitioner must establish: (1) the evidence at issue is favorable to him, either because it is exculpatory, or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the defendant suffered prejudice as a result. Juniper v. Zook, 876 F.3d 551, 564 (4th Cir. 2017) (citing Banks v. Dretke, 540 U.S. 668, 691 (2004)). A petitioner must show more than a "mere possibility" that exculpatory evidence existed. United States v. Caro, 733 F. App'x 651, 663 (4th Cir. 2018).

Saunders claims that the Commonwealth suppressed evidence showing that the projectile from the gun used to shoot Roberts came from a pellet gun rather than a firearm and that if the Commonwealth had disclosed the evidence, the court would not have convicted him of possession of a firearm. Am. Pet., ECF No. 10 at 25. Saunders refers to a memorandum prepared by Kyle Richards, apparently an investigator with the Commonwealth's Attorney's office. Richards interviewed Detective Casey Allen as part of the Commonwealth's response to Saunders' motion for a writ of actual innocence. The memorandum is dated June 9, 2021, and states the following:

> Casey Allen was a detective with the Danville Police Department back in 2013 and was the lead detective in the Saunders case. Having obtained a medical release form from Roberts, Allen went to the Piedmont Surgical Center and retrieved the fragment(s) that were surgically removed from Roberts. Allen stated that the fragment(s) came inside of a clear, glass container. Allen does not recall having to sign any documents at the surgical center to obtain the container. Allen also does not recall what the fragment(s) looked like and was unable to provide a description.
>
> From the surgical center, Allen went to the courthouse and gave the container to the Commonwealth Attorney who submitted it

14

> to the court as evidence. Allen stated that all of this was done on the day of trial.
>
> When asked if Allen was present for any sort of pretrial conference which involved Roberts, the Commonwealth Attorney, Allen and/or any other LEOs, Allen stated that he does not recall being part of one. Allen does not recall Roberts ever telling him that he was shot with a BB/pellet gun.

Richards Mem. from Actual Innocence File at 535, ECF No. 29 at 1. Saunders claims that he never received the fragments and asserts that the failure of the Commonwealth to disclose the existence of the fragments violated his due process rights under Brady.

Saunders presented this claim to the Commonwealth in both his second habeas petition and in his petition for a writ of actual innocence, but neither court addressed the claim on the merits. When a state court does not adjudicate the merits of a claim properly before it, a federal court bypasses § 2254(d)'s limitations on relief and reviews the claim de novo. Plymail, 8 F.4th at 316; Valentino v. Clarke, 972 F.3d 560, 576 (4th Cir. 2020); Gordon v. Braxton, 780 F.3d 196, 202 (4th Cir. 2015). On de novo review, the court asks only if there was constitutional error. Plymail, 8 F.4th at 317 (citing Hudson v. Hunt, 235 F.3d 892, 895 (4th Cir. 2000)). In the context of Saunders' Brady claim, this requires the court to determine whether the evidence was favorable to Saunders, whether the evidence was suppressed by the State, either willfully or inadvertently; and whether prejudice ensued. Juniper, 876 F.3d at 564.

Having considered the record as a whole, the court finds that the Commonwealth did not suppress exculpatory evidence in the form of metal fragments because it cannot conclude that the Commonwealth ever possessed the metal fragments. This case presents unique circumstances because notwithstanding Allen's claim that he gave the metal fragments to the prosecutor, the record does not support his contention. First, the court notes that in addition

15

to the memorandum above, which was produced almost eight years after the trial, Allen testified at the evidentiary hearing, which occurred almost twelve years after the trial. At the hearing, Allen stated that he remembered going to an outpatient surgical center in Danville, Virginia, to obtain metal fragments that had been removed from Roberts' chest. Evid. H'r'g Tr., ECF No. 52 at 35. He said he placed the fragments in a clear case, sealed it with evidence tape, and marked the container with the proper identifying information. Id. at 35–36. Although he had no independent recollection of logging a narrative regarding the fragments into the case file, he should have done so. Id. at 36–37. He described the fragments as being small, dark, metallic, and "twisted up." Id. at 37, 50–51. He said he went to the outpatient surgical center on the same day that Roberts had the fragments removed from under his skin, which also was the day of Saunders' trial. Immediately after obtaining the fragments, he went to the Danville Circuit Courthouse and gave the container to the Commonwealth's attorney or to someone on his team. Id. at 39–41, 51.

Allen testified that it was unusual to obtain evidence such as the fragments on the day of trial. Typically, he would have obtained such evidence prior to trial, and it would have been logged into the evidence room at the police station. Id. at 44–45. He said that the reason he retrieved the fragments so close to the time of trial was because Roberts did not want to have them removed but his mother convinced him to do so to strengthen the prosecution's case as police had not recovered a firearm. Id. at 52–53. Allen said that he testified at Saunders' trial about obtaining the metal fragments from the medical center. Id. at 46.

Although Allen testified under oath to the above, nothing else in the record supports his account. There is no record of metal fragments being logged into evidence in Saunders'

16

case. See Letter from Danville Police Dep't dated June 17, 2021, ECF No. 29 at 2 ("After an extensive search, no records could be found on the information you requested. No evidence was ever logged in to our property vault in relation to this case. The Danville Police Department does not possess a property log or any evidence in reference to this incident."). Nor is there any reference to Allen obtaining the metal fragments in the written records relating to Saunders' case. See Def. Exh. 1 to Evidentiary H'r'g. Nor was the records custodian at the SOVAH hospital in Danville, which took information from the scheduling system utilized by the Piedmont Surgery Center, able to confirm either that Roberts had the metal fragments removed or that the fragments were turned over to Allen or anyone else. See letter from SOVAH Health dated June 15, 2021 (stating that Roberts was seen by a doctor on July 18, 2013, July 26, 2013, and August 12, 2013, but did not appear for appointments on August 23, 2013, or October 3, 2013).

The Commonwealth's attorney who tried Saunders' case testified at the evidentiary hearing that he did not recall Detective Allen giving him any metal fragments before trial or on the day of trial. Id. at 170–71. He said that if Allen had given him metal fragments, he would not have taken possession of them, because the only way they could be introduced would have been through the detective. Id. at 172–73. Saunders' attorney had no recollection of being provided with metal fragments on the day of trial. Id. at 76–77. In addition, contrary to Allen's testimony at the evidentiary hearing that he testified about the metal fragments at the trial, the trial transcript does not reflect that he did so. Allen's only testimony at Saunders' trial related to his showing Roberts a photo lineup from which he identified Saunders. Trial Tr., ECF No. 13-6 at 67–71. Finally, on the day of trial, Roberts testified that he was "supposed

17

to go back" to the doctor the following Thursday "to take it out." Trial Tr., ECF No. 13-6 at 50–51.

Based on the foregoing, the court cannot conclude that Allen gave metal fragments that were removed from Roberts' chest to the Commonwealth's attorney or anyone associated with the prosecution, at any time before or during the trial. The court does not ascribe any improper motive to Allen for saying he did so, but given the other evidence in the case, and in particular Allen's remembering that he testified at trial about the metal fragments when he did not, and Roberts' testimony that he was scheduled to have surgery in the future to "take it out," there is no basis for finding anything other than Allen misremembered events that occurred many years before he described them. The record does not support the conclusion that the Commonwealth possessed metal fragments that were removed from Roberts' body or that it failed to disclose that it had metal fragments. For this reason, the court must dismiss Saunders' Brady claim.

### (2) Ineffective Assistance of Counsel Claim

Saunders claims that his attorney provided ineffective assistance of counsel when he failed to investigate and obtain all of Roberts' medical records related to the shooting. Although the Commonwealth provided Saunders' counsel with 20 pages of medical records, the records did not contain certain CT and x-ray images. Saunders asserts that his attorney should have subpoenaed all the medical records and should have sought an expert to examine the records and testify on his behalf. Mot., ECF No. 10 at 35–37.

Saunders contends that although his ineffective assistance of counsel claim was filed after the statute of limitations had passed, he is entitled to equitable tolling of the limitations

18

period. Before discussing whether Saunders is entitled to equitable tolling, the court will recount information that became known or available to Saunders both before and after trial, as it pertains to the claim.

### (a) Evidence Regarding Nature of Projectile

The Commonwealth provided two relevant batches of discovery to Saunders in advance of trial. On July 25, 2013, the Commonwealth gave Saunders copies of his criminal record, the Danville police report prepared in relation to the events of July 4 and 5, 2013, and photographs of Roberts' injuries and of the individuals presented to Roberts in a photo lineup conducted by the Danville Police Department during its investigation. See ECF No. 13-7 at 8. The Commonwealth also informed Saunders that Roberts had been convicted of possession of a schedule II narcotic in 2009. Id. On October 15, 2013, the Commonwealth provided Saunders the record of his juvenile conviction, 20 pages of Roberts' hospital records, and Saunders' written statement to the police.[8] Id. at 19.

In October 2020, more than six years after Saunders was convicted, he contacted Penny Roberts, the victim's mother, and informed her that the trial court sentenced him to a five-year term on the possession of a firearm charge because Roberts testified that Saunders shot him with a .22 caliber firearm.[9] Penny told Saunders that before his trial, she witnessed her son tell the prosecutor that Saunders had used a .22 caliber air pellet rifle, not a firearm, to shoot him. At Saunders' request, Penny obtained additional medical records related to Roberts'

---

[8] This statement does not appear in the record.
[9] Because Danny Roberts and Penny Roberts have the same last name, the court will refer to the victim's mother as "Penny."

treatment after he was shot and provided them to Saunders via his attorney. Decl. of Penny Roberts, ECF No. 10-1 at 38.

In relevant part, Roberts' medical records contain CT scans and an x-ray of his chest and abdomen. See id. at 43–53, 58–62, 67, 70. On July 8, 2013, Dr. Stacy Jo Williams ordered chest and abdominal/pelvic CT scans, which were reviewed by Dr. G. Michael Spencer. Id. at 58–59. Dr. Spencer's impression of the images were that they showed a "[s]ubcutaneous metallic foreign body in the left upper abdomen without associated fractures, soft tissue air or hematoma. This presumably represents a subcutaneous bullet or bullet fragment." Id. at 58. On further review, Dr. Douglas R. May found that the CT scans showed "apical blebs[,] . . . probable fatty infiltration of the liver . . .[, and] mild pancreatic duct dilation," but that "[n]o other abnormalities are seen." Id. at 61. Dr. Spencer also examined a chest x-ray, which he found showed "[n]o acute plain radiographic findings." Id. at 60. Notably, the records that Saunders obtained via Penny also contained images of the fragment imbedded under Roberts' skin. Id. at 67, 70.

After receiving Roberts' medical records, Saunders contacted Ronald R. Scott, an independent forensic consultant who provided services related to firearms and ballistics analysis. See Affidavit of Ronald R. Scott, ECF No. 10-1, at 63–82. Scott reviewed Roberts' medical records, including the CT scans and x-ray image, and concluded that the object shown in the radiographic images was not a bullet, but rather a domed pellet, which can only be discharged from an air gun.[10] Id. at 65–66. Scott explained that a domed pellet is recognized

---

[10] The version of Scott's report attached to Saunders' amended petition is neither signed nor dated. See ECF No. 10-1, at 63–82. Accordingly, the court cannot identify when Scott prepared the report, but the court assumes that it was prepared after Saunders received Roberts' medical records in December 2020 and before

20

by its distinctive shape, which includes a skirt, waist, and domed head. Id. at 66. Scott opined that the radiographic images "clearly show[] the rounded head, the tapered waist, and the skirt" of the domed pellet and that the object could not have been propelled from a firearm by explosive action. Id. Scott also stated that the "projectile wound of Danny Roberts is totally inconsistent with the wounding effect of a bullet discharged from a firearm by means of an explosive charge (propellant)." Id. Scott explained that the penetration of a .22 caliber bullet would produce "a temporary large wound cavity followed by the permanent, and much smaller, wound cavity after the projectile terminates in the soft tissue and the temporary cavity collapses" because of the bullet's heavy mass and fast velocity. Id. In contrast, the mass and velocity of a domed pellet of a similar caliber is much lower. Id. Scott attached one of Roberts' radiographic images of the projectile and annotated it to show the skirt, waist, and domed head of the object. Id. at 70.

At the evidentiary hearing, Saunders' counsel explained that Scott had retired and that Saunders would call John Nixon to testify. Evid. H'r'g Tr., ECF No. 52 at 9–10. After direct and cross examination, the court allowed Nixon to testify as an expert on terminal and wound ballistics. Id. at 111–123. Nixon testified that he reviewed Scott's affidavit and the images attached to the affidavit and agreed with Scott's conclusion that the projectile pictured in Roberts' chest was a pellet from an air gun. Id. at 123–24, 129–30. Nixon based his conclusion on the shape of the projectile, the fact that it did not do much damage to Roberts or penetrate very far under his skin, which was typical for a low-energy projectile like a pellet, and because

_____

the Virginia Court of Appeals ruled on the actual innocence petition on February 9, 2022, because the court referenced the analysis in its decision. ECF No. 13-1, at 10.

21

Roberts had testified at trial that the weapon made a "pshht" sound rather than the louder sound that would be made by a .22 caliber rifle. Id. at 135–39.

Nixon also testified that he had received a computer disk with the CT scans taken of Roberts' abdomen but had not been able to access the images on the disk. Id. at 124–25. The court explained that because Nixon had no knowledge of the origin of the disk, it was impossible to lay a proper evidentiary foundation for the images which in turn made it impossible to ascertain from the record that the images were of Roberts' abdomen. Id. at 127–29. The court gave Nixon and Saunders' counsel additional time to try to access the images on the disk. Id. at 129.

Following the hearing, counsel for Saunders docketed a declaration from Nixon, explaining that he had been able to open the disk and view the images. The images contained written documentation identifying them as having been taken of Roberts on July 8, 2013. Decl. of John Nixon, ECF No. 46-1 at 2. Nixon concluded that the images showed a pellet from an air gun lodged below the skin on Roberts' left side, below his lower rib and above his pelvis. Id. at 2. He based his conclusion on three independent bases:

> 1)The radiographic images clearly show an image of a classic airgun pellet that has a domed front (head), slim central area (waist), and a flared rear area (skirt). This is extremely unlikely to be a fragment from a firearm projectile and in my opinion 99%+ likely to be an airgun pellet.
>
> 2) The penetration of the pellet was minimal given that it was reported to have been fired from a distance of only 15 feet from Mr Roberts. Even low performance firearms would be expected to penetrate much further (often completely penetrating and exiting the body).
>
> 3) Mr Roberts reported that he heard a pssst (hissing) sound. This is consistent with the sound made by an airgun, and inconsistent

22

with the sound from a firearm. Even the lowest performing firearms generate noise at a level that motivates users and bystanders to wear hearing protection.

Id. at 2.[11]

### (b) Equitable Tolling

The one-year statute of limitations in habeas claims is subject to tolling in appropriate cases. Holland v. Florida, 560 U.S. 631, 645 (2010). A petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Id. at 649 (quoting Pace v DiGuglielmo, 544 U.S. at 408, 418 (2005)). "'The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence.'" Justus v. Clarke, 78 F.4th 97, 105 (4th Cir. 2023) (quoting Holland, 560 U.S. at 653 (cleaned up). The court found in its previous memorandum opinion that Saunders satisfied the diligence requirement of the Holland test. Mem. Op., ECF No. 27 at 39, but left for further development whether an extraordinary circumstance stood in his way and prevented him from timely filing his habeas petition.

Regarding what counts as an "extraordinary circumstance" that prevents a petitioner from timely filing a habeas petition, a petitioner must show that something "beyond his control or external to his own conduct" kept him from filing. Justus, 78 F.4th at 105 (quoting Rouse

---

[11] Saunders also provided an affidavit explaining how he had come to possess the medical records and disk containing the CT and x-ray images. He stated that after he contacted Penny, she obtained Roberts' medical records and mailed them to attorney Glenn Berger, who then mailed the records to Saunders in prison. Saunders filed his petition for actual innocence in state court and mailed the records and disk to Scott, the first expert in the case. Attorney Joseph Painter was appointed to represent Saunders on his actual innocence petition, and Scott mailed the records and the disk to attorney Painter. Saunders discharged Painter, and the Commonwealth appointed Naomi Huntington as new counsel. Painter sent the records and disk to Huntington. The Assistant Attorney General asked to review the records and disk, and the review occurred on November 4, 2021. After Saunders' actual innocence petition was denied, Huntington delivered the records and the disk to Saunders' current attorney, Nia Vidal. Aff. of Jamal Saunders, a/k/a Forever Al-Mani Hamilton, ECF No. 47-1.

v. Lee, 339 F.3d 238, 246 (4th Cir. 2003)). The Holland court recognized that "a garden variety claim of excusable neglect" such as a "simple miscalculation" that leads a lawyer to miss a filing deadline does not warrant equitable tolling. Holland, 560 U.S. at 651–52 (quoting Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990) and Lawrence v. Florida, 549 U.S. 327, 336 (2007)). In Holland, a death row inmate's attorney failed to file a federal habeas petition despite the inmate writing several letters to the attorney informing him of the filing deadline. Holland, 560 U.S. at 652. In addition, the attorney failed to communicate with the inmate, failed to do basic research on the case, and failed to inform the inmate of a crucial decision in his case. Id. The Supreme Court remanded the case to the appellate court with instructions to determine whether the facts of the case entitled Holland to equitable tolling or whether further proceedings might indicate the respondent should prevail. Id. at 654.

Saunders claims that the "extraordinary circumstance" that prevented him from filing his habeas petition on time was that his trial counsel was ineffective for failing to obtain the medical records and it was his duty to do so. Pet's Reply to Resp. to Mot. to Dismiss, ECF No. 23 at 34–36. However, any failure on the part of Saunders' attorney to obtain and investigate the medical records prior to trial did not cause Saunders to be unable to seek federal habeas review.

The one-year federal statute of limitations began on January 11, 2016, and expired on January 11, 2017. Saunders did not file a proper petition in this court until July 10, 2023, more than six years too late, and his attorney's conduct in 2013 did not prevent him from filing his federal petition in a timely manner. He avers that he did not learn of the existence of the additional medical records until 2020 when he contacted Penny and she gave him the

24

remainder of the medical evidence, but he has not described any effort he made to contact Penny or otherwise obtain Roberts' full medical records prior to the expiration of the limitations period, much less explained what might have kept him from doing so. Accordingly, Saunders is not entitled to equitable tolling of the statute of limitations and his claim of ineffective assistance of counsel is subject to dismissal as time-barred.

Nevertheless, as set forth below, the court will consider Saunders' time-barred claim on the merits as he has made a showing of actual innocence sufficient to allow the court to consider his claim on the merits. See McQuiggin v. Perkins, 569 U.S. 383, 386 (2013) (holding that a successful showing of actual innocence can overcome the one-year statute of limitations on habeas petitions).

### D. Procedural Default

In addition to Saunders' ineffective assistance claim being subject to dismissal as time-barred, he did not timely file his state court petition and the Virginia Supreme Court dismissed his ineffective assistance claim on that ground, citing Va. Code § 8.01-654(A)(2), which sets out the relevant statute of limitations for a state habeas petition. Order by Virginia Sup. Ct., ECF No. 13-5 at 8. When a petitioner defaults his federal claim in state court pursuant to an independent and adequate state procedural rule, "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991), holding modified by Martinez v. Ryan, 566 U.S. 1 (2012).

25

It is undisputed that "Virginia Code § 8.01-654(A)(2) constitutes an adequate and independent state-law procedural rule." Baker v. Clarke, 95 F. Supp. 3d 913, 917–18 (E.D. Va. 2015). Accordingly, Saunders' ineffective assistance of counsel claim is procedurally defaulted.

In order for this court to review Saunders' ineffective assistance claim on the merits, he must show either cause and actual prejudice or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. He may show a fundamental miscarriage of justice if he can show that he is actually innocent of the conviction he is challenging. Schlup v. Delo, 513 U.S. 298, 314–315 (1995).

Regarding cause and prejudice, Saunders cannot show cause for the procedural default. "The existence of cause for procedural default 'ordinarily turn[s] on whether [a] petitioner can show that some objective factor external to the defense' impeded [his] efforts to comply with the State's procedural rule." Farabee v. Clarke, 967 F.3d 380, 395–96 (4th Cir. 2020) (quoting Mueller v. Angelone, 181 F.3d 557, 585 (4th Cir. 1999)). Saunders has made no showing of cause as to why he was late in filing his state court habeas petition. To the extent he is blaming his trial counsel for the delay, his excuse fails. As there is no constitutional right to counsel in state post-conviction proceedings, "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." Coleman, 501 U.S. at 752. "In the absence of a constitutional violation, the petitioner bears the risk in federal habeas for all attorney errors made in the course of the representation …." Id. at 754. Because he cannot show cause and

26

prejudice for his procedural default, this court can review Saunders' ineffective assistance of counsel claim on the merits only if he can make a showing of actual innocence.[12]

The Supreme Court has recognized a miscarriage-of-justice exception to procedural default that seeks to "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." Schlup, 513 U.S. at 324. A credible claim of actual innocence does not by itself provide a basis for relief. Rather, it serves as a "gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Id. at 315.

Such a claim must be supported by new reliable evidence.

> Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim. However, if a petitioner ... presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

---

[12] In Martinez, 566 U.S. at 8, the Court recognized a narrow exception to the holding in Coleman that absent a right to counsel in a collateral proceeding, an attorney's errors in the proceeding do not establish cause for a procedural default. The Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." Id. at 9. A petitioner may invoke this exception when "the initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial" and his attorney failed to do so. See discussion, id., at 8–18. The exception in Martinez does not apply to Saunders because although Virginia law provides that claims involving ineffective assistance of counsel must be brought in a habeas action rather than on direct appeal, Lenz v. Commonwealth, 261 Va. 451, 460, 544 S.E. 2d 299, 304 (2001), the Virginia Supreme Court did not dismiss his claim of ineffective assistance of counsel because he had failed to raise it in his first collateral proceeding, id. at 7, but because both his initial-review collateral proceeding and his second state habeas motion were time-barred. See Order by Virginia Sup. Ct., ECF No. 13-5 at 8; see also Resp's Brief in Support of Rule 5 Answer and Mot. to Dism., ECF No. 13 at 2 (noting that Saunder's first state habeas petition also was dismissed as time-barred). See Couch v. Woodson, No. 3:13cv146, 2013 WL 5933543, at *2 (E.D. Va. Nov. 5, 2013) (finding Martinez has no applicability to cases barred by limitations).

Id. at 316. Examples of "new reliable evidence" include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. at 324. The petitioner "'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" McQuiggin, 569 U.S. at 399 (quoting Schlup, 513 U.S. at 327). When determining what reasonable, properly instructed jurors would do, the court must consider "all the evidence, old and new, incriminating and exculpatory." House v. Bell, 547 U.S. 518, 538 (2006) (citing Schlup, 513 U.S. at 329). "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." Wolfe v. Dotson, 144 F.4th 218, 234 (4th Cir. 2025) (citing Finch v. McKoy, 914 F.3d 292, 299 (4th Cir. 2019)) cert. denied, U.S. No. 25-664, 2026 WL 1052117 (U.S. Apr. 20, 2026).

In the Fourth Circuit, "new evidence" includes evidence that is newly presented, rather than only newly discovered evidence that was not available at trial. Wolfe, 144 F.3d at 234. "As we have explained, the Schlup standard is broad, encompassing both 'evidence that became available only after trial' and evidence 'unavailable or excluded at trial.'" Id. (quoting Royal v. Taylor, 188 F.3d 239, 244 (4th Cir. 1999) (in turn citing Schlup, 513 U.S. at 327–28). See also McDowell v. Dotson, No. 7:23CV00569, 2025 WL 2461212, at *4 (W.D. Va. Aug. 26, 2025) (Jones, J.) (quoting Schlup, 513 U.S. at 324) ("[N]othing in Schlup indicates that a petitioner may only put forward newly discovered evidence. The requirement is that the petitioner submit 'new reliable evidence ... that was not presented at trial.'").

Saunders claims that he has made a sufficient showing of actual innocence of his conviction of possession of a firearm to allow him to pass through the Schlup gateway and

28

have the court consider his ineffective assistance of counsel claim on the merits. The court agrees.

In order to be convicted for possession of a firearm under Va. Code § 18.2-308.2(A), the Commonwealth must prove beyond a reasonable doubt that the person "possessed an instrument which was designed, made, and intended to expel a projectile by means of an explosion." Armstrong, 263 Va. at 583, 562 S.E.2d at 145. An air rifle or pellet gun that does not expel a projectile by means of an explosion does not meet the definition of firearm under the statute. Startin, 281 Va. at 382, 706 S.E.2d at 878 (citing Holloman, 221 Va. at 197, 269 S.E.2d at 357 and Armstrong, 263 Va. at 583, 562 S.E.2d at 145).

It is undisputed that no medical evidence from Roberts' post-shooting treatment was offered at Saunders' trial. Nor was any expert testimony regarding the nature of the projectile imbedded under Roberts' skin presented at trial. Accordingly, the medical evidence presented at the evidentiary hearing along with the evidence offered by Nixon at the hearing and via his sworn declaration after the hearing are new evidence under Schlup and Wolfe. In addition, when the radiological evidence is coupled with Nixon's affidavit explaining how he determined that the images came from Roberts, the evidence is reliable in the sense that there is an evidentiary basis establishing that the images were of Roberts and show the projectile lodged under his skin. Additionally, Saunders' affidavit regarding the chain of custody of the medical records and disk containing the images satisfies the court as to their authenticity and that they are records of Roberts' treatment after he was wounded.

Finally, the court finds that Nixon's testimony regarding the radiological evidence and his statement that the projectile came from an air gun for three independent reasons--the pellet

29

shape, the limited pellet penetration, and the low reported sound level--meet the test of showing that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. At trial, Roberts testified that the weapon looked like a ".22 rifle gun" and that he "[knew] all guns." Id. at 56. But he also testified that he "didn't even feel nothing" when he was shot and was surprised to see blood on his shirt later. Trial Tr., ECF No. 13-6 at 45–46. In addition, he testified that the weapon made a "pshht" sound and that "[i]t wasn't nothing loud." Id. at 56. He agreed that the weapon did not "bang like a … a rifle[.]" Id.

Saunders' counsel argued to the court that there was reasonable doubt that the weapon used to shoot Roberts was a firearm, based on the sound it made, that the wound was not serious, and that no bullet or casing was found. Id. at 98. The court responded that there was evidence that Roberts was shot with a projectile. Id. at 100. Later, in response to a statement by the prosecutor that he believed the Commonwealth had met its burden of proof on all the charges, and "at the very least, the wounding," the court stated, "Well, even if it's a pellet gun it's capable of projecting or expelling a projectile by force, is it not? I mean, is there case law that says that a pellet gun is not a firearm 'cause the jury instruction, I mean, that's what the jury instruction says." Id. at 107. The court did not discuss further whether the weapon was a firearm for purposes of Va. Code § 18.2-308.2(A) but found Saunders guilty of the offense. Id. at 109. However, with both of these comments, the court appears to be referencing the use of a weapon in a threatening manner while attempting to commit malicious wounding/injury charge, Va. Code § 18.2-53.1, which contains a broader definition of firearm. See Holloman, 221 Va. at 199, 269 S.E.2d at 358 (holding, in discussion of weapon used to

30

commit violation of § 18.2-53.1 that "[t]he victim of a crime can be intimidated as much by a revolver that does not fire bullets as by one that does; such victim cannot be required to distinguish between a loaded pistol and a spring gun when it is brandished during commission of a felony.")

The court finds that if the evidence contained in Roberts' medical records, along with expert testimony, were presented to a trier of fact, it is more likely than not that Saunders would not have been convicted on the possession of a firearm charge. His testimony that the weapon "looked like" a .22 caliber rifle would have been weighed not only against his further testimony that the weapon made a hissing noise and that he did not realize he had been shot, but also against the images of the projectile showing its dome, waist, and skirt, and against the expert's opinion that the image of the fragment in Saunders' body was "99%+ likely to be an airgun pellet." Nixon Decl., ECF No. 46-1 at 2. The court finds that this evidence meets the "more likely than not" standard for establishing actual innocence. Accordingly, by presenting evidence of actual innocence of the charge, Saunders has opened the door for the court to consider his ineffective assistance of counsel claim on the merits.

Because this claim was not reviewed on the merits by the state habeas court, this court may consider it de novo. Plymail, 8 F.4th at 316; Valentino, 972 F.3d at 576; Gordon, 780 F.3d at 202. On de novo review, the court asks only if there was constitutional error. Plymail, 8 F.4th at 317 (citing Hudson, 235 F.3d at 895).

**E. Merits**

Criminal defendants have a Sixth Amendment right to effective legal assistance. Strickland v. Washington, 466 U.S. 668, 687 (1984). To establish that counsel's assistance was

31

not reasonably effective, a defendant must satisfy a two-prong analysis: he must show both that counsel's performance fell below an objective standard of reasonableness and that he was prejudiced by counsel's alleged deficient performance. Strickland, 466 U.S. at 669.

When considering the reasonableness prong of Strickland, courts apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also Gray v. Branker, 529 F.3d 220, 228–29 (4th Cir. 2008) (quoting Strickland, 466 U.S. at 688) ("The performance of counsel is measured in terms of 'reasonableness under prevailing professional norms.'") The court must judge counsel "on the facts of the particular case," and assess counsel's performance "from counsel's perspective at the time." Strickland, 466 U.S. at 689. "The performance prong is satisfied when counsel provides reasonably effective assistance, including demonstrating legal competence, doing relevant research, and raising important issues." United States v. Carthorne, 878 F.3d 458, 465 (4th Cir. 2017) (citing Strickland, 466 U.S. at 687–90).

To satisfy the prejudice prong of Strickland, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Saunders argues that Eisner, his trial counsel, was ineffective because upon receiving 20 pages of Roberts' medical records, including a report that referred to the CT scan of Roberts' abdomen, he should have subpoenaed the actual images, but did not. The report described "a metallic foreign body which may represent a bullet or bullet fragment seen in the subcutaneous tissues of the left side of the upper abdomen," without evidence of underlying

fractures or "subcutaneous or deep air," and "no adjacent hematoma." Saunders argues that had Eisner obtained the images, he would have been able to impeach Roberts' testimony as to the nature of the weapon used and would have been able to hire an expert to testify about the nature of metallic fragment pictured on the images. Mot., ECF No. 10 at 33–37.

At the evidentiary hearing, Eisner testified that he had no independent recollection of Saunders' prosecution. It was established that he presented an alibi defense, and that such a defense typically is based on statements from the client. Evid. H'r'g Tr., ECF No. 52 at 65–66. In support of the alibi defense, Eisner subpoenaed two witnesses who testified as to Saunders' whereabouts on the afternoon of the shooting. Id. at 66. It was further established that Eisner did not subpoena any of Roberts' medical records.

In addition to the alibi defense, at trial, Eisner argued that based on Roberts' testimony, the weapon used to shoot him was not a firearm under the statute. Id. at 70. At the evidentiary hearing, the court cited to Roberts' trial testimony regarding the "pshht" sound made by the rifle, that he did not think he had been shot, and that he knew it "won't [sic] a real gun" when he heard it. Id. at 77 (quoting Trial Tr., ECF No. 13-6 at 56.). The court then asked Eisner:

> Now, in hearing that testimony and looking at the discovery in this case, did anything suggest to you that you should get the x-rays or images that are reflected in the radiology report and look at them yourself or have an expert look at them to see whether or not they were bullets from a firearm capable of expelling a projectile by means of an explosion or a pellet gun?

Id. at 78. Eisner replied, "Honestly, like, hearing that, it struck me as this would be a failure of the commonwealth to prove the identity of the object. It did not occur to me that I should be looking at additional records." Id.

Regarding an attorney's duty to investigate, the Court in Strickland stated the following:

33

> [S]trategic choices made after thorough investigation of law and
> facts relevant to plausible options are virtually unchallengeable;
> and strategic choices made after less than complete investigation
> are reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation. In other
> words, counsel has a duty to make reasonable investigations or
> to make a reasonable decision that makes particular investigations
> unnecessary. In any ineffectiveness case, a particular decision not
> to investigate must be directly assessed for reasonableness in all
> the circumstances, applying a heavy measure of deference to
> counsel's judgments.

Id. at 690–91. Here, Eisner's investigation stopped short of subpoenaing Roberts' medical records so that he could review the images himself or present them to an expert for review. While in hindsight this decision appears to have been faulty given what the images showed and the conclusions reached by Scott and Nixon, when viewed at the time of Saunders' prosecution, and applying "a heavy measure of deference," the decision was reasonable.

On October 1, 2013, the Commonwealth provided discovery to Saunders' counsel, including 20 pages of Roberts' hospital records, and stated that it was unaware of any further discoverable evidence or exculpatory evidence. ECF No. 13-7 at 19–20. The records contained a reference to a metallic foreign body in Roberts' left upper abdomen which "presumably represent[ed] a subcutaneous bullet or bullet fragment." Def.'s Ex. 7 at Evid. H'r'g. Eisner had no reason to second-guess the physician's interpretation of the scan, at least until Roberts testified during a preliminary hearing that the gun made a "pshht" sound, and no one who testified at the evidentiary hearing could pinpoint when the preliminary hearing had occurred. The information contained in the report would not have put a reasonable attorney on notice that he needed to obtain the actual images underlying the report. Moreover, as Eisner pointed out in response to questioning from the Commonwealth's attorney, if he had obtained the

34

images and they showed that the fragment was, in fact, a bullet fragment, it would have confirmed that it came from a firearm. Evid. H'r'g Tr., ECF No. 52 at 69.

In addition, once Roberts testified, Eisner cross-examined him regarding the sound the weapon made when it fired and elicited his testimony that he did not think he had been shot and that he knew it was not a "real gun" when he heard it. Roberts went on to argue to the court that the weapon could not have been a firearm under the possession of a firearm statute based on Roberts' testimony.

Furthermore, Roberts subpoenaed witnesses and presented an alibi defense based on Saunders' suggestion. While an attorney is not precluded from presenting conflicting theories of defense, Brown v. Dixon, 891 F.2d 490, 494–95 (4th Cir. 1989), an attorney cannot be deemed ineffective for failing to raise alternative arguments. Ellis v. United States, No. DKC 04-3157, 2010 WL 3639226, at *5 (D. Md. Sept. 14, 2010). Nor is an attorney deficient for choosing not to present an unsupported and potentially damaging defense. Champion v. United States, No. 1:21-cv-00018-MR, 2022 WL 617132, at *11 (W.D.N.C. Mar. 2, 2022). To be sure, once Eisner heard Roberts' preliminary hearing and trial testimony, he argued to the court that the weapon Saunders used could not have been a firearm under the statute. But had that been his primary argument, the alibi defense would have been undermined. See Hunt v. Nuth 57 F.3d 1327, 1333 (4th Cir. 1995) ("[T]rial counsel's decisions, although readily assailable by experts in trial advocacy equipped with twenty-twenty hindsight, were essentially tactical choices within the realm of reasonable assistance of counsel.") Finally, even if Roberts' decision to not obtain the medical records in support of a pellet gun theory was inadvertent rather than the result of trial strategy, "[c]ounsel is not ineffective merely because he overlooks

one strategy while vigilantly pursuing another." Williams v. Kelly, 816 F.2d 939, 950 (4th Cir. 1987) (citing Strickland, 466 U.S. at 689).

In sum, Eisner's decision to not obtain the actual images was reasonable given the physician's interpretation that the images showed a bullet or bullet fragment. While it appears now, 13 years after his trial, that Saunders' defense to the firearm charge would have been strengthened had Eisner subpoenaed the CT images and obtained expert testimony to interpret them, the fact that he did not do so does not mean that he provided ineffective representation. Strickland does not require that defendants receive the best possible representation at trial, but only that they receive "adequate counsel judged by a standard of reasonableness in light of the prevailing norms of practice." Hunt, 57 F.3d at 1333. Eisner provided effective representation under Strickland. Accordingly, the court dismisses Saunders' petition for habeas relief based on ineffective assistance of counsel.

## IV. Conclusion

Based on the foregoing, the court **DISMISSES** Saunders' petition for habeas corpus relief pursuant to 28 U.S.C. § 2254. Because Saunders has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c) and Slack v. McDaniel, 529 U.S. 473, 484 (2000), a certificate of appealability is **DENIED**.

An appropriate Order will be entered.

It is so **ORDERED**.

Entered: June 4, 2026

Michael F. Urbanski
Senior United States District Judge

36